# JACOBSON *v.* UNITED STATES

No. 90–1124.  Argued November 6, 1991—Decided April 6, 1992

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, SOUTER, and THOMAS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined, and in which SCALIA, J., joined except as to Part II, *post*, p. 554.

*George H. Moyer, Jr.,* argued the cause and filed briefs for petitioner.

*Paul J. Larkin, Jr.,* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Vicki S. Marani.**

---

*\*Bennett L. Gershman, Steven R. Shapiro,* and *John A. Powell* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Gregory U. Evans, Daniel B. Hales, George D. Webster, Jack E. Yelverton, Fred E. Inbau, Wayne W. Schmidt, Bernard J. Farber,* and *James P.*

JUSTICE WHITE delivered the opinion of the Court.

On September 24, 1987, petitioner Keith Jacobson was indicted for violating a provision of the Child Protection Act of 1984 (Act), Pub. L. 98–292, 98 Stat. 204, which criminalizes the knowing receipt through the mails of a "visual depiction [that] involves the use of a minor engaging in sexually explicit conduct . . . ." 18 U. S. C. § 2252(a)(2)(A). Petitioner defended on the ground that the Government entrapped him into committing the crime through a series of communications from undercover agents that spanned the 26 months preceding his arrest. Petitioner was found guilty after a jury trial. The Court of Appeals affirmed his conviction, holding that the Government had carried its burden of proving beyond reasonable doubt that petitioner was predisposed to break the law and hence was not entrapped.

Because the Government overstepped the line between setting a trap for the "unwary innocent" and the "unwary criminal," *Sherman* v. *United States*, 356 U. S. 369, 372 (1958), and as a matter of law failed to establish that petitioner was independently predisposed to commit the crime for which he was arrested, we reverse the Court of Appeals' judgment affirming his conviction.

I

In February 1984, petitioner, a 56-year-old veteran-turned-farmer who supported his elderly father in Nebraska, ordered two magazines and a brochure from a California adult bookstore. The magazines, entitled Bare Boys I and Bare Boys II, contained photographs of nude preteen and

---

*Manak* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the National Center for Missing and Exploited Children et al. by *H. Robert Showers* and *Judith Drazen Schretter;* and for Congressman Thomas J. Bliley, Jr., et al. by *James P. Mueller, Michael J. Lockerby,* and *David E. Anderson.*

teenage boys. The contents of the magazines startled petitioner, who testified that he had expected to receive photographs of "young men 18 years or older." Tr. 425. On cross-examination, he explained his response to the magazines:

> "[PROSECUTOR]: [Y]ou were shocked and surprised that there were pictures of very young boys without clothes on, is that correct?
>
> "[JACOBSON]: Yes, I was.
>
> "[PROSECUTOR]: Were you offended?
>
> .          .          .          .          .
>
> "[JACOBSON]: I was not offended because I thought these were a nudist type publication. Many of the pictures were out in a rural or outdoor setting. There was—I didn't draw any sexual connotation or connection with that." *Id.,* at 463.

The young men depicted in the magazines were not engaged in sexual activity, and petitioner's receipt of the magazines was legal under both federal and Nebraska law. Within three months, the law with respect to child pornography changed; Congress passed the Act illegalizing the receipt through the mails of sexually explicit depictions of children. In the very month that the new provision became law, postal inspectors found petitioner's name on the mailing list of the California bookstore that had mailed him Bare Boys I and II. There followed over the next 2½ years repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore petitioner's willingness to break the new law by ordering sexually explicit photographs of children through the mail.

The Government began its efforts in January 1985 when a postal inspector sent petitioner a letter supposedly from the American Hedonist Society, which in fact was a fictitious organization. The letter included a membership application and stated the Society's doctrine: that members had the

"right to read what we desire, the right to discuss similar interests with those who share our philosophy, and finally that we have the right to seek pleasure without restrictions being placed on us by outdated puritan morality." Record, Government Exhibit 7. Petitioner enrolled in the organization and returned a sexual attitude questionnaire that asked him to rank on a scale of one to four his enjoyment of various sexual materials, with one being "really enjoy," two being "enjoy," three being "somewhat enjoy," and four being "do not enjoy." Petitioner ranked the entry "[p]re-teen sex" as a two, but indicated that he was opposed to pedophilia. *Ibid.*

For a time, the Government left petitioner alone. But then a new "prohibited mailing specialist" in the Postal Service found petitioner's name in a file, Tr. 328–331, and in May 1986, petitioner received a solicitation from a second fictitious consumer research company, "Midlands Data Research," seeking a response from those who "believe in the joys of sex and the complete awareness of those lusty and youthful lads and lasses of the neophite *[sic]* age." Record, Government Exhibit 8. The letter never explained whether "neophite" referred to minors or young adults. Petitioner responded: "Please feel free to send me more information, I am interested in teenage sexuality. Please keep my name confidential." *Ibid.*

Petitioner then heard from yet another Government creation, "Heartland Institute for a New Tomorrow" (HINT), which proclaimed that it was "an organization founded to protect and promote sexual freedom and freedom of choice. We believe that arbitrarily imposed legislative sanctions restricting *your* sexual freedom should be rescinded through the legislative process." *Id.*, Defendant's Exhibit 102. The letter also enclosed a second survey. Petitioner indicated that his interest in "[p]reteen sex-homosexual" material was above average, but not high. In response to another question, petitioner wrote: "Not only sexual expression but freedom of the press is under attack. We must be ever vigilant

to counter attack right wing fundamentalists who are determined to curtail our freedoms." *Id.,* Government Exhibit 9.

HINT replied, portraying itself as a lobbying organization seeking to repeal "all statutes which regulate sexual activities, except those laws which deal with violent behavior, such as rape. HINT is also lobbying to eliminate any legal definition of 'the age of consent.'" *Id.,* Defendant's Exhibit 113. These lobbying efforts were to be funded by sales from a catalog to be published in the future "offering the sale of various items which we believe you will find to be both interesting and stimulating." *Ibid.* HINT also provided computer matching of group members with similar survey responses; and, although petitioner was supplied with a list of potential "pen pals," he did not initiate any correspondence.

Nevertheless, the Government's "prohibited mailing specialist" began writing to petitioner, using the pseudonym "Carl Long." The letters employed a tactic known as "mirroring," which the inspector described as "reflect[ing] whatever the interests are of the person we are writing to." Tr. 342. Petitioner responded at first, indicating that his interest was primarily in "male-male items." Record, Government Exhibit 9A. Inspector "Long" wrote back:

> "My interests too are primarily male-male items. Are you satisfied with the type of VCR tapes available? Personally, I like the amateur stuff better if its *[sic]* well produced as it can get more kinky and also seems more real. I think the actors enjoy it more." *Id.,* Government Exhibit 13.

Petitioner responded:

> "As far as my likes are concerned, I like good looking young guys (in their late teens and early 20's) doing their thing together." *Id.,* Government Exhibit 14.

Petitioner's letters to "Long" made no reference to child pornography. After writing two letters, petitioner discontinued the correspondence.

By March 1987, 34 months had passed since the Government obtained petitioner's name from the mailing list of the California bookstore, and 26 months had passed since the Postal Service had commenced its mailings to petitioner. Although petitioner had responded to surveys and letters, the Government had no evidence that petitioner had ever intentionally possessed or been exposed to child pornography. The Postal Service had not checked petitioner's mail to determine whether he was receiving questionable mailings from persons—other than the Government—involved in the child pornography industry. Tr. 348.

At this point, a second Government agency, the Customs Service, included petitioner in its own child pornography sting, "Operation Borderline," after receiving his name on lists submitted by the Postal Service. *Id.*, at 71–72. Using the name of a fictitious Canadian company called "Produit Outaouais," the Customs Service mailed petitioner a brochure advertising photographs of young boys engaging in sex. Record, Government Exhibit 22. Petitioner placed an order that was never filled. *Id.*, Government Exhibit 24.

The Postal Service also continued its efforts in the Jacobson case, writing to petitioner as the "Far Eastern Trading Company Ltd." The letter began:

> "As many of you know, much hysterical nonsense has appeared in the American media concerning 'pornography' and what must be done to stop it from coming across your borders. This brief letter does not allow us to give much comments; however, why is your government spending millions of dollars to exercise international censorship while tons of drugs, which makes yours the world's most crime ridden country are passed through easily." *Id.*, Government Exhibit 1.

The letter went on to say:

> "[W]e have devised a method of getting these to you without prying eyes of U. S. Customs seizing your

mail. . . . After consultations with American solicitors, we have been advised that once we have posted our material through your system, it cannot be opened for any inspection without authorization of a judge." *Ibid.*

The letter invited petitioner to send for more information. It also asked petitioner to sign an affirmation that he was "not a law enforcement officer or agent of the U. S. Government acting in an undercover capacity for the purpose of entrapping Far Eastern Trading Company, its agents or customers." Petitioner responded. *Ibid.* A catalog was sent, *id.*, Government Exhibit 2, and petitioner ordered Boys Who Love Boys, *id.*, Government Exhibit 3, a pornographic magazine depicting young boys engaged in various sexual activities. Petitioner was arrested after a controlled delivery of a photocopy of the magazine.

When petitioner was asked at trial why he placed such an order, he explained that the Government had succeeded in piquing his curiosity:

"Well, the statement was made of all the trouble and the hysteria over pornography and I wanted to see what the material was. It didn't describe the—I didn't know for sure what kind of sexual action they were referring to in the Canadian letter." Tr. 427–428.

In petitioner's home, the Government found the Bare Boys magazines and materials that the Government had sent to him in the course of its protracted investigation, but no other materials that would indicate that petitioner collected, or was actively interested in, child pornography.

Petitioner was indicted for violating 18 U. S. C. § 2252(a)(2)(A). The trial court instructed the jury on the petitioner's entrapment defense,[1] petitioner was convicted, and a di-

---

[1] The jury was instructed:

"As mentioned, one of the issues in this case is whether the defendant was entrapped. If the defendant was entrapped he must be found not

vided Court of Appeals for the Eighth Circuit, sitting en banc, affirmed, concluding that "Jacobson was not entrapped as a matter of law." 916 F. 2d 467, 470 (1990). We granted certiorari. 499 U. S. 974 (1991).

## II

There can be no dispute about the evils of child pornography or the difficulties that laws and law enforcement have encountered in eliminating it. See generally *Osborne* v. *Ohio*, 495 U. S. 103, 110 (1990); *New York* v. *Ferber*, 458 U. S. 747, 759–760 (1982). Likewise, there can be no dispute that the Government may use undercover agents to enforce the law. "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells* v. *United States*, 287 U. S. 435, 441 (1932); *Sherman*, 356 U. S., at 372; *United States* v. *Russell*, 411 U. S. 423, 435–436 (1973).

In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. *Sorrells, supra*, at 442; *Sherman, supra*, at 372. Where the Government has induced an

---

guilty. The government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped.

"If the defendant before contact with law-enforcement officers or their agents did not have any intent or disposition to commit the crime charged and was induced or persuaded by law-enforcement officers o[r] their agents to commit that crime, then he was entrapped. On the other hand, if the defendant before contact with law-enforcement officers or their agents did have an intent or disposition to commit the crime charged, then he was not entrapped even though law-enforcement officers or their agents provided a favorable opportunity to commit the crime or made committing the crime easier or even participated in acts essential to the crime." App. 11–12.

individual to break the law and the defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents. *United States* v. *Whoie*, 288 U. S. App. D. C. 261, 263–264, 925 F. 2d 1481, 1483–1484 (1991).[2]

Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later. In

---

[2] Inducement is not at issue in this case. The Government does not dispute that it induced petitioner to commit the crime. The sole issue is whether the Government carried its burden of proving that petitioner was predisposed to violate the law *before* the Government intervened. The dissent is mistaken in claiming that this is an innovation in entrapment law and in suggesting that the Government's conduct prior to the moment of solicitation is irrelevant. See *post*, at 556–557. The Court rejected these arguments six decades ago in *Sorrells* v. *United States*, 287 U. S. 435 (1932), when the Court wrote that the Government may not punish an individual "for an alleged offense which is the product of the creative activity of its own officials" and that in such a case the Government "is in no position to object to evidence of the activities of its representatives in relation to the accused . . . ." *Id.*, at 451. Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument, submitting that the evidence it developed during the course of its investigation was probative because it indicated petitioner's state of mind *prior* to the commencement of the Government's investigation. See Tr. of Oral Arg. 41, 49.

This long-established standard in no way encroaches upon Government investigatory activities. Indeed, the Government's internal guidelines for undercover operations provide that an inducement to commit a crime should not be offered unless:

"(a) [T]here is a reasonable indication, based on information developed through informants or other means, that the subject is engaging, has engaged, or is likely to engage in illegal activity of a similar type; *or*

"(b) The opportunity for illegal activity has been structured so that there is reason for believing that persons drawn to the opportunity, or brought to it, are predisposed to engage in the contemplated illegal activity." Attorney General's Guidelines on FBI Undercover Operations (Dec. 31, 1980), reprinted in S. Rep. No. 97–682, p. 551 (1982).

such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition. See *United States* v. *Sherman*, 200 F. 2d 880, 882 (CA2 1952). Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction. *Mathews* v. *United States*, 485 U. S. 58, 66 (1988).

But that is not what happened here. By the time petitioner finally placed his order, he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985. *Sorrells, supra,* at 442; *Sherman,* 356 U. S., at 372.

The prosecution's evidence of predisposition falls into two categories: evidence developed prior to the Postal Service's mail campaign, and that developed during the course of the investigation. The sole piece of preinvestigation evidence is petitioner's 1984 order and receipt of the Bare Boys magazines. But this is scant if any proof of petitioner's predisposition to commit an illegal act, the criminal character of which a defendant is presumed to know. It may indicate a predisposition to view sexually oriented photographs that are responsive to his sexual tastes; but evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition.

Furthermore, petitioner was acting within the law at the time he received these magazines. Receipt through the mails of sexually explicit depictions of children for noncommercial use did not become illegal under federal law until May 1984, and Nebraska had no law that forbade petitioner's possession of such material until 1988. Neb. Rev. Stat. § 28-813.01 (1989). Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it. This obedience may reflect a generalized respect for legality or the fear of prosecution, but for whatever reason, the law's prohibitions are matters of consequence. Hence, the fact that petitioner legally ordered and received the Bare Boys magazines does little to further the Government's burden of proving that petitioner was predisposed to commit a criminal act. This is particularly true given petitioner's unchallenged testimony that he did not know until they arrived that the magazines would depict minors.

The prosecution's evidence gathered during the investigation also fails to carry the Government's burden. Petitioner's responses to the many communications prior to the ultimate criminal act were at most indicative of certain personal inclinations, including a predisposition to view photographs of preteen sex and a willingness to promote a given agenda by supporting lobbying organizations. Even so, petitioner's responses hardly support an inference that he would commit the crime of receiving child pornography through the mails.[3] Furthermore, a person's inclinations and "fantasies . . . are

---

[3] We do not hold, as the dissent suggests, see *post*, at 559–560, that the Government was required to prove that petitioner knowingly violated the law. We simply conclude that proof that petitioner engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing.

his own and beyond the reach of government . . . ." *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 67 (1973); *Stanley* v. *Georgia,* 394 U. S. 557, 565–566 (1969).

On the other hand, the strong arguable inference is that, by waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials, the Government not only excited petitioner's interest in sexually explicit materials banned by law but also exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights. For instance, HINT described itself as "an organization founded to protect and promote sexual freedom and freedom of choice" and stated that "the most appropriate means to accomplish [its] objectives is to promote honest dialogue among concerned individuals and to continue its lobbying efforts with State Legislators." Record, Defendant's Exhibit 113. These lobbying efforts were to be financed through catalog sales. *Ibid.* Mailings from the equally fictitious American Hedonist Society, *id.,* Government Exhibit 7, and the correspondence from the nonexistent Carl Long, *id.,* Defendant's Exhibit 5, endorsed these themes.

Similarly, the two solicitations in the spring of 1987 raised the spectre of censorship while suggesting that petitioner ought to be allowed to do what he had been solicited to do. The mailing from the Customs Service referred to "the worldwide ban and intense enforcement on this type of material," observed that "what was legal and commonplace is now an 'underground' and secretive service," and emphasized that "[t]his environment forces us to take extreme measures" to ensure delivery. *Id.,* Government Exhibit 22. The Postal Service solicitation described the concern about child pornography as "hysterical nonsense," decried "international censorship," and assured petitioner, based on consultation with "American solicitors," that an order that had been posted could not be opened for inspection without au-

thorization of a judge. *Id.*, Government Exhibit 1. It further asked petitioner to affirm that he was not a Government agent attempting to entrap the mail order company or its customers. *Ibid.* In these particulars, both Government solicitations suggested that receiving this material was something that petitioner ought to be allowed to do.

Petitioner's ready response to these solicitations cannot be enough to establish beyond reasonable doubt that he was predisposed, prior to the Government acts intended to create predisposition, to commit the crime of receiving child pornography through the mails. See *Sherman*, 356 U. S., at 374. The evidence that petitioner was ready and willing to commit the offense came only after the Government had devoted 2½ years to convincing him that he had or should have the right to engage in the very behavior proscribed by law. Rational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches to petitioner. As was explained in *Sherman*, where entrapment was found as a matter of law, "the Government [may not] pla[y] on the weaknesses of an innocent party and beguil[e] him into committing crimes which he otherwise would not have attempted." *Id.*, at 376.

Law enforcement officials go too far when they "implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells*, 287 U. S., at 442 (emphasis added). Like the *Sorrells* Court, we are "unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them." *Id.*, at 448. When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if

left to his own devices, likely would have never run afoul of the law, the courts should intervene.

Because we conclude that this is such a case and that the prosecution failed, as a matter of law, to adduce evidence to support the jury verdict that petitioner was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law by receiving child pornography through the mails, we reverse the Court of Appeals' judgment affirming the conviction of Keith Jacobson.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, and with whom JUSTICE SCALIA joins except as to Part II, dissenting.

Keith Jacobson was offered only two opportunities to buy child pornography through the mail. Both times, he ordered. Both times, he asked for opportunities to buy more. He needed no Government agent to coax, threaten, or persuade him; no one played on his sympathies, friendship, or suggested that his committing the crime would further a greater good. In fact, no Government agent even contacted him face to face. The Government contends that from the enthusiasm with which Mr. Jacobson responded to the chance to commit a crime, a reasonable jury could permissibly infer beyond a reasonable doubt that he was predisposed to commit the crime. I agree. Cf. *United States* v. *Hunt*, 749 F. 2d 1078, 1085 (CA4 1984) (ready response to solicitation shows predisposition), cert. denied, 472 U. S. 1018 (1985); *United States* v. *Kaminski*, 703 F. 2d 1004, 1008 (CA7 1983) ("'the most important factor . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement'") (quoting *United States* v. *Reynoso-Ulloa*, 548 F. 2d 1329, 1336 (CA9 1977), cert. denied, 436 U. S. 926 (1978)); *United States* v. *Sherman*, 200 F. 2d 880, 882 (CA2 1952) (indication of pre-

disposition is a defendant's willingness to commit the offense "'as evinced by ready complaisance'" (citation omitted)).

The first time the Government sent Mr. Jacobson a catalog of illegal materials, he ordered a set of photographs advertised as picturing "young boys in sex action fun." He enclosed the following note with his order: "I received your brochure and decided to place an order. If I like your product, I will order more later." Record, Government Exhibit 24. For reasons undisclosed in the record, Mr. Jacobson's order was never delivered.

The second time the Government sent a catalog of illegal materials, Mr. Jacobson ordered a magazine called "Boys Who Love Boys," described as: "11 year old and 14 year old boys get it on in every way possible. Oral, anal sex and heavy masturbation. If you love boys, you will be delighted with this." *Id.*, Government Exhibit 2. Along with his order, Mr. Jacobson sent the following note: "Will order other items later. I want to be discreet in order to protect you and me." *Id.*, Government Exhibit 3.

Government agents admittedly did not offer Mr. Jacobson the chance to buy child pornography right away. Instead, they first sent questionnaires in order to make sure that he was generally interested in the subject matter. Indeed, a "cold call" in such a business would not only risk rebuff and suspicion, but might also shock and offend the uninitiated, or expose minors to suggestive materials. Cf. *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 748 (1978) (right to be free from offensive material in one's home); 39 U. S. C. § 3010 (regulating the mailing of sexually explicit advertising materials). Mr. Jacobson's responses to the questionnaires gave the investigators reason to think he would be interested in photographs depicting preteen sex.

The Court, however, concludes that a reasonable jury could not have found Mr. Jacobson to be predisposed beyond a reasonable doubt on the basis of his responses to the Government's catalogs, even though it admits that, by that time,

he was predisposed to commit the crime. The Government, the Court holds, failed to provide evidence that Mr. Jacobson's obvious predisposition at the time of the crime "was independent and not the product of the attention that the Government had directed at petitioner." *Ante*, at 550. In so holding, I believe the Court fails to acknowledge the reasonableness of the jury's inference from the evidence, redefines "predisposition," and introduces a new requirement that Government sting operations have a reasonable suspicion of illegal activity before contacting a suspect.

I

This Court has held previously that a defendant's predisposition is to be assessed as of the time the Government agent first suggested the crime, not when the Government agent first became involved. *Sherman* v. *United States,* 356 U. S. 369, 372–376 (1958). See also *United States* v. *Williams,* 705 F. 2d 603, 618, n. 9 (CA2), cert. denied, 464 U. S. 1007 (1983). Until the Government actually makes a suggestion of criminal conduct, it could not be said to have "implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . . ." *Sorrells* v. *United States,* 287 U. S. 435, 442 (1932). Even in *Sherman* v. *United States, supra,* in which the Court held that the defendant had been entrapped as a matter of law, the Government agent had repeatedly and unsuccessfully coaxed the defendant to buy drugs, ultimately succeeding only by playing on the defendant's sympathy. The Court found lack of predisposition based on the Government's numerous unsuccessful attempts to induce the crime, not on the basis of preliminary contacts with the defendant.

Today, the Court holds that Government conduct may be considered to create a predisposition to commit a crime, even before any Government action to induce the commission of the crime. In my view, this holding changes entrapment doctrine. Generally, the inquiry is whether a suspect is pre-

disposed before the Government induces the commission of the crime, not before the Government makes initial contact with him. There is no dispute here that the Government's questionnaires and letters were not sufficient to establish inducement; they did not even suggest that Mr. Jacobson should engage in any illegal activity. If all the Government had done was to send these materials, Mr. Jacobson's entrapment defense would fail. Yet the Court holds that the Government must prove not only that a suspect was predisposed to commit the crime before the opportunity to commit it arose, but also before the Government came on the scene. *Ante,* at 548–549.

The rule that preliminary Government contact can create a predisposition has the potential to be misread by lower courts as well as criminal investigators as requiring that the Government must have sufficient evidence of a defendant's predisposition *before it ever seeks to contact him.* Surely the Court cannot intend to impose such a requirement, for it would mean that the Government must have a reasonable suspicion of criminal activity before it begins an investigation, a condition that we have never before imposed. The Court denies that its new rule will affect run-of-the-mill sting operations, *ante,* at 549–550, and one hopes that it means what it says. Nonetheless, after this case, every defendant will claim that something the Government agent did before soliciting the crime "created" a predisposition that was not there before. For example, a bribetaker will claim that the description of the amount of money available was so enticing that it implanted a disposition to accept the bribe later offered. A drug buyer will claim that the description of the drug's purity and effects was so tempting that it created the urge to try it for the first time. In short, the Court's opinion could be read to prohibit the Government from advertising the seductions of criminal activity as part of its sting operation, for fear of creating a predisposition in its suspects. That limitation would be especially likely to

hamper sting operations such as this one, which mimic the advertising done by genuine purveyors of pornography. No doubt the Court would protest that its opinion does not stand for so broad a proposition, but the apparent lack of a principled basis for distinguishing these scenarios exposes a flaw in the more limited rule the Court today adopts.

The Court's rule is all the more troubling because it does not distinguish between Government conduct that merely highlights the temptation of the crime itself, and Government conduct that threatens, coerces, or leads a suspect to commit a crime in order to fulfill some other obligation. For example, in *Sorrells*, the Government agent repeatedly asked for illegal liquor, coaxing the defendant to accede on the ground that " 'one former war buddy would get liquor for another.' " 287 U. S., at 440. In *Sherman*, the Government agent played on the defendant's sympathies, pretending to be going through drug withdrawal and begging the defendant to relieve his distress by helping him buy drugs. 356 U. S., at 371.

The Government conduct in this case is not comparable. While the Court states that the Government "exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights," *ante*, at 552, one looks at the record in vain for evidence of such "substantial pressure." The most one finds is letters advocating legislative action to liberalize obscenity laws, letters which could easily be ignored or thrown away. Much later, the Government sent separate mailings of catalogs of illegal materials. Nowhere did the Government suggest that the proceeds of the sale of the illegal materials would be used to support legislative reforms. While one of the HINT letters suggested that lobbying efforts would be funded by sales from a catalog, Record, Defendant's Exhibit 113, the catalogs actually sent, nearly a year later, were from different fictitious entities (Produit Outaouais and Far Eastern Trading Company), and gave no

suggestion that money would be used for any political purposes. *Id.*, Government Exhibit 22, Government Exhibit 2. Nor did the Government claim to be organizing a civil disobedience movement, which would protest the pornography laws by breaking them. Contrary to the gloss given the evidence by the Court, the Government's suggestions of illegality may also have made buyers beware, and increased the mystique of the materials offered: "For those of you who have enjoyed youthful material . . . we have devised a method of getting these to you without prying eyes of U. S. Customs seizing your mail." *Id.*, Government Exhibit 1. Mr. Jacobson's curiosity to see what " 'all the trouble and the hysteria' " was about, *ante*, at 547, is certainly susceptible of more than one interpretation. And it is the jury that is charged with the obligation of interpreting it. In sum, the Court fails to construe the evidence in the light most favorable to the Government, and fails to draw all reasonable inferences in the Government's favor. It was surely reasonable for the jury to infer that Mr. Jacobson was predisposed beyond a reasonable doubt, even if other inferences from the evidence were also possible.

## II

The second puzzling thing about the Court's opinion is its redefinition of predisposition. The Court acknowledges that "[p]etitioner's responses to the many communications prior to the ultimate criminal act were . . . indicative of certain personal inclinations, including a predisposition to view photographs of preteen sex . . . ." *Ante*, at 551. If true, this should have settled the matter; Mr. Jacobson was predisposed to engage in the illegal conduct. Yet, the Court concludes, "petitioner's responses hardly support an inference that he would commit the crime of receiving child pornography through the mails." *Ibid.*

The Court seems to add something new to the burden of proving predisposition. Not only must the Government

show that a defendant was predisposed to engage in the illegal conduct, here, receiving photographs of minors engaged in sex, but also that the defendant was predisposed to break the law knowingly in order to do so. The statute violated here, however, does not require proof of specific intent to break the law; it requires only knowing receipt of visual depictions produced by using minors engaged in sexually explicit conduct. See 18 U. S. C. § 2252(a)(2); *United States* v. *Moncini*, 882 F. 2d 401, 404–406 (CA9 1989). Under the Court's analysis, however, the Government must prove *more* to show predisposition than it need prove in order to convict.

The Court ignores the judgment of Congress that specific intent is not an element of the crime of receiving sexually explicit photographs of minors. The elements of predisposition should track the elements of the crime. The predisposition requirement is meant to eliminate the entrapment defense for those defendants who would have committed the crime anyway, even absent Government inducement. Because a defendant might very well be convicted of the crime here absent Government inducement even though he did not know his conduct was illegal, a specific intent requirement does little to distinguish between those who would commit the crime without the inducement and those who would not. In sum, although the fact that Mr. Jacobson's purchases of Bare Boys I and Bare Boys II were legal at the time may have some relevance to the question of predisposition, it is not, as the Court suggests, dispositive.

The crux of the Court's concern in this case is that the Government went too far and "abused" the "'processes of detection and enforcement'" by luring an innocent person to violate the law. *Ante*, at 553, quoting *Sorrells*, 287 U. S., at 448. Consequently, the Court holds that the Government failed to prove beyond a reasonable doubt that Mr. Jacobson was predisposed to commit the crime. It was, however, the jury's task, as the conscience of the community, to decide whether Mr. Jacobson was a willing participant in the crimi-

nal activity here or an innocent dupe. The jury is the traditional "defense against arbitrary law enforcement." *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968). Indeed, in *Sorrells,* in which the Court was also concerned about overzealous law enforcement, the Court did not decide itself that the Government conduct constituted entrapment, but left the issue to the jury. 287 U. S., at 452. There is no dispute that the jury in this case was fully and accurately instructed on the law of entrapment, and nonetheless found Mr. Jacobson guilty. Because I believe there was sufficient evidence to uphold the jury's verdict, I respectfully dissent.