■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JESUS TORRES, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Suffolk County (McInerney, J.), rendered May 19, 1989, convicting him of criminal sale of a controlled substance in the first degree and criminal possession of a controlled substance in the first degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Suffolk County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

In 1985, the defendant and his business partner had been

running a successful roofing business in Suffolk County for several years. Also for several years, the defendant, his wife, his business partner, and their mutual friends, were users of cocaine on weekends. The defendant's one-gram-a-week cocaine habit had been supplied by his business partner.

The defendant, who had met a confidential informant, Christos Xanthoudakis, known as Chris Dakis, briefly in 1980, encountered him again in April 1985 through one of their mutual friends. Over the ensuing months, the defendant and Dakis became close friends, and the defendant bought increasing amounts of cocaine from or through Dakis.

However, in July 1985 in a peculiar reversal of roles, the defendant arranged with Dakis to sell Dakis's "partner"— undercover Detective Paul Marquardt—a half kilo of cocaine for $27,500. According to the detective's account, it was natural for a drug dealer of the sort that Detective Marquardt was pretending to be to constantly seek new sources of supply. According to the defendant, Dakis told him that Marquardt, a major drug dealer, had threatened Dakis's life if Dakis could not come up with the quantity of cocaine that Marquardt required, at a time when Dakis's original supplier had become unavailable. Dakis pleaded with the defendant to rescue him by supplying Marquardt with half to one kilo of cocaine, which the defendant, in fear for his friend's life, undertook to do.

In the defendant's first attempt to deliver the drugs to Marquardt in the early evening of July 25, 1985, the detective rejected the proffered contraband, because it weighed only four ounces. After renewed efforts, the defendant reappeared several hours later with the demanded half kilo of cocaine, and was arrested.

Following an earlier trial, the defendant was convicted of the same crimes, but this court reversed the conviction and remitted the matter to the Supreme Court for a new trial, because of an error in the court's charge on the defendant's entrapment defense (see, People v Torres, 136 AD2d 664). There was no testimony by Dakis at this second trial that the defendant had ever admitted to him that he, the defendant, dealt cocaine, or that their mutual friends had ever indicated that the defendant was a dealer of cocaine.

The affirmative defense of entrapment presents the issue of whether the defendant is "a person not otherwise disposed to commit" the crime charged (People v Calvano, 30 NY2d 199, 203). "A defendant's predisposition is not to be assessed 'as of

the time when he committed the crime.' Normally, predisposition refers to the state of mind of a defendant before government agents make any suggestion that he should commit a crime" *(United States v Williams,* 705 F2d 603, 618, *cert denied* 464 US 1007). In a recent case discussing the entrapment defense, the United States Supreme Court ruled that "[i]n their zeal to enforce the law * * * Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute" *(Jacobson v United States,* 503 US —, —, 112 S Ct 1535, 1540).

There is absolutely *nothing* in the instant record to indicate that before meeting Dakis the defendant was "predisposed" to possess more than a gram of cocaine at a time, or to sell *any* quantity of cocaine at all—let alone to possess over four ounces or to sell two ounces of cocaine (Penal Law §§ 40.05, 220.21, 220.43). Rather, the evidence established that before he met Dakis in April 1985 the defendant purchased a single gram of cocaine a week, on average, apparently from his business partner, and that he shared it with his wife and friends on weekends. Detective Marquardt testified, for example, that he had never heard of the defendant as a drug seller before Dakis mentioned him to the detective. The defendant's own account of his pre-Dakis cocaine involvement was corroborated by the testimony of his wife and one of their mutual friends. Neither Dakis nor Marquardt nor anyone else testified that they knew or had heard that the defendant ever possessed or sold large quantities of drugs.

The weight of the evidence adduced at the trial established that police agents actively induced the defendant to commit a quite uncharacteristic crime. Indeed, when Dakis was asked what caused Detective Marquardt to arrange to "set up a deal between himself and this defendant," Dakis testified: "he [Marquardt] wanted to further his case, to obtain evidence, apparently, to go ahead and purchase the cocaine from Jay and do what he had to do". This testimony, which supports the defendant's claim of entrapment, is corroborated by Detective Marquardt, who testified regarding the commencement of his investigation of the defendant two days before his arrest: "On the 23rd of July, 1985, I met with Mr. Xanthoudakis at my office and had an official debriefing relative to Mr. Torres and the course of action that was going to be taken. At that time I directed Mr. Xanthoudakis to reach out to Mr. Torre and arrange for a transaction of a quantity of at least a half a kilo of cocaine". There is no evidence in the record that the defendant initiated the sale. We further note that the defendant was taped

explaining to Detective Marquardt that he was selling the drugs on behalf of Dakis, that he was not making any profit on the sale, that he could not afford to finance the transaction, and that he would rather be a "legit" roofer than deal drugs.

In addition, the instant record is unintelligible without recourse to the defendant's explanation that his good friend Dakis begged him for help in obtaining a half kilo of cocaine for his formidable customer Marquardt, who had threatened to kill Dakis if the drugs were not hastily supplied. Thus, the defendant is recorded reassuring Dakis, who presses the defendant not to fail on the delivery because "I don't wanna * * * die [at Marquardt's] hands". It is not otherwise clear why the defendant, who in the past had only *received* cocaine from Dakis (which Dakis himself admitted on the stand), should suddenly try to *sell* a substantial amount of the same drug. We also note that the defendant's tape-recorded conversation with Detective Marquardt, which was admitted into evidence, contains a 2½ minute gap, during which, according to the defendant, Marquardt's threats to kill Dakis were discussed. The prosecution's own expert witness testified that the gap had *not* occurred as Detective Marquardt had explained—by the accidental detachment of a suction cup—but had resulted from the detective hitting the "stop" button, and then the "play" button. Based upon the foregoing, we tend to credit the defendant's account of the content of the missing conversation.

Under the circumstances, we find that the affirmative defense of entrapment was established by the preponderance of the credible evidence and that the defendant is entitled to reversal of his conviction and dismissal of the indictment *(see,* Penal Law § 25.00 [2]). Balletta, J. P., Miller, Pizzuto and Santucci, JJ., concur.