991 F.2d 797
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Janet Lois Baker RODGERS, Carlos David Villarreal,
Defendants-Appellants.
 Nos. 92-5648, 92-5769.
 United States Court of Appeals, Sixth Circuit.
 March 31, 1993.
 
 Before KEITH and BATCHELDER, Circuit Judges, and TAYLOR, District Judge*
 PER CURIAM.
 
 
 1
 Both appellants were convicted of drug charges stemming from a sale of marijuana to undercover police. Originally, both were indicted for conspiracy to possess with intent to distribute and conspiring to distribute approximately fifty pounds of marijuana in violation of 21 U.S.C. § 846; Villarreal was also charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Rodgers was convicted by a jury and sentenced to twenty-one months in prison and three years of supervised release to follow. Villarreal committed another drug offense while on bond awaiting trial and was again captured; he pled guilty to all charges pursuant to a written plea agreement. The District Court sentenced him to seventy months. Rodgers appeals both her conviction and sentence; Villarreal challenges his sentence. We affirm on all issues raised.
 
 
 2
 1. Rodger's entrapment defense.
 
 
 3
 At trial, Rodgers asserted that the Government had entrapped her into arranging a marijuana sale. At trial, she moved for a judgment of acquittal based on the same defense; she now appeals the District Court's denial of this motion. We review the denial of a defendant's motion for acquittal by examining the record as a whole to determine whether it supports a finding of guilt beyond a reasonable doubt; the Government gets the benefit of the doubt where the court must draw inferences from the record. United States v. Overmyer, 867 F.2d 937, 938 (6th Cir.), cert. denied, 493 U.S. 813 (1989).
 
 
 4
 Rodgers testified that one evening she was approached at a local tavern by a man who introduced himself as "Don Barnes," who befriended her and asked her to come to his motel room and "smoke a joint." While she did not accompany him, she gave him her phone number. "Don Barnes" was actually one Charles Marrs, an undercover informant who had been arrested on drug charges and who was helping Kentucky police track down drug dealers. Marrs did call Rodgers, and within a week's time the two apparently became lovers, and saw each other or conversed frequently. At trial, she denied ever being involved in selling drugs before, and claimed Marrs used her affections for him to pressure her into setting up the drug deal.
 
 
 5
 Marrs testified that he had asked Rodgers about getting him marijuana the first time they met, and that she had said she could. He admitted to becoming involved with Rodgers to some degree, and to pursuing arranging a purchase with her. According to Marrs, she said she could get marijuana from two friends, and told him that two quality grades of the drug would be available, the lower grade more readily so. Marrs told Rodgers that his "brother" would actually buy the marijuana. When she was ready to make the deal, Marrs and Detective Rodney Ballard of the Kentucky State Police, who was posing as his brother, met Rodgers in a parking lot. Ballard was wired for sound; other government officers and agents watched and listened (when the microphone was working) from a distance.
 
 
 6
 There, Rodgers explained that she could provide up to 150 pounds of marijuana, and agreed to sell Ballard a one-pound "sample." Ballard gave her $1,700 for the sample. She left for a while, and returned with the sample. During this period, agents trailed her to a house later identified as belonging to a Rene Lamar Perez; the house was next door to defendant Villarreal's. Ballard, Marrs and Rodgers then decided to meet later to give Rodgers time to go and get another twenty five pounds. When later that day they met again, and she stated that the marijuana was available and that she had seen it, she was arrested. Agents proceeded to the Perez house with a search warrant; when they arrived, Perez ran out the back door, and his girlfriend leapt out a side window and ran into Villarreal's house. The agents pursued the fleeing woman, and Villarreal let them into his house. Most of the marijuana found was in Villarreal's house, along with various drug-related paraphernalia, a gun, and large amounts of money, including $1,600 of the cash Ballard had given to Rodgers, which he had previously xeroxed.
 
 
 7
 Where a defendant shows that the Government induced him to commit a crime (inducement is not denied here), the Government must prove beyond a reasonable doubt that "a predisposition to commit the particular crime for which the defendant was indicted existed prior to and independent of Government contact with him." Jacobson v. United States, --- U.S. ----, ----, 112 S.Ct. 1535, 1541 (1992). However, evidence of predisposition may be collected subsequent to contact with government agents, and we again look at the record as a whole for such evidence. The record must reflect "that the defendant had the inclination to commit the crime with which he is charged, and that his criminal inclination did not possibly result from the seductions of Government agents." United States v. Kussmaul, --- F.2d ----, ----, No. 92-3314 (6th Cir.1993), slip op. at 6-7.
 
 
 8
 Reviewed in the light most favorable to the Government, the evidence shows Rodgers's predisposition to sell marijuana. She readily and affirmatively responded when Marrs asked her if she knew where he could get some marijuana. She readily agreed to sell marijuana to Ballard, first one pound, then more, offering up to 150 pounds for sale. "The ready commission of the criminal act amply demonstrates the defendant's predisposition." Jacobson, 112 S.Ct. at 1541 (citing United States v. Sherman, 200 F.2d 880, 882 (2d Cir.1952)). Neither Ballard nor Marrs made threats or were otherwise coercive; their actions "did not exhibit the persistent and overzealous Government pursuit of a reluctant and unresponsive individual over an extended period of time which so offended the Jacobson Court." Kussmaul, slip op. at 7-8.
 
 
 9
 While we do not condone the unseemly spectacle of an undercover informant getting not only information but also sex from a target of investigation, this is not a case akin to Sorrells v. United States, 287 U.S. 435 (1932), where an undercover agent played on the trust and camaraderie of an "otherwise innocent" fellow veteran to get him to track down contraband for him. Id. at 441. According to Det. Ballard, Rodgers knew quite a bit about marijuana, for example, the difference in quality between "Kentucky homegrown" (high quality) and "Mexican" (lesser quality), and how Mexican marijuana had to be steamed so that it would not crumble in its typically highly packed, dried condition. In making arrangements with both Marrs and Ballard, Rodgers used colloquial terms common to drug dealing, as opposed to drug use. For example, she described Perez's home as her "gingerbread house," which Ballard explained meant, in his experience, a house where deals were done but where the dealers did not store drugs, the supply being kept nearby at a different location. This setup described exactly what police found; the drugs were kept at the Villarreal residence.
 
 
 10
 Further, Perez testified that he had sold marijuana to Rodgers several times before, and that she typically resold it at her workplace. Rodgers contends that Perez's testimony was "incredible," essentially because he is a drug dealer; on appeal, however, we cannot substitute our own judgments as to a witness's credibility for those of the trial judge or the jury, particularly where we must consider Perez's testimony in the light most favorable to the Government's representations.
 
 
 11
 Since the evidence supports the conclusion that Rodgers was predisposed to commit the crime of dealing marijuana and readily availed herself of the opportunity to break the law, we hold the District Court's denial of her motion for acquittal based on entrapment to be correct and not clearly erroneous.
 
 
 12
 2. Rodgers's right to pretrial disclosure of Marrs's identity.
 
 
 13
 Prior to trial, Rodgers moved that the court compel the Government to disclose the true identity and the whereabouts of Marrs, the man she knew only as "Don Barnes." The court denied her motion. She now argues that this denial compromised her defense and thus violated her constitutional rights, invoking Roviaro v. United States, 353 U.S. 53 (1957), where the Court held that a defendant was entitled to such disclosure where "the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense, or is essential to a fair determination of a cause." Id. at 61.
 
 
 14
 Roviaro did not give the defense access on demand, however. The court's decision to compel requires "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." Roviaro, 353 U.S. at 62. We review the District Court's decision for an abuse of discretion, and where the defendant implicates the informant in asserting an entrapment defense, we require evidence of entrapment beyond "mere conjecture or supposition about the possible relevancy of the informant's testimony." United States v. Sharp, 778 F.2d 1182, 1187 (6th Cir.1985), cert. denied, 475 U.S. 1030 (1986). The presumption is strongly in favor of nondisclosure; in Sharp, we reversed the decision of the trial court to compel disclosure in part due to the court's failure to conduct an in camera interview of the informant to get a better picture of the relative benefits of disclosure.
 
 
 15
 Rodgers presented no hard evidence of entrapment to the District Court, even in the form of a sworn affidavit, on which the court could consider her motion to disclose. While the Government put forth no evidence that Marrs would be endangered if his identity were revealed, it did make assurances that all confidential informants would be called at trial; we note that the confidential informant in Roviaro was never called at trial despite the defendant's having shown him to be singularly responsible for inducing the criminal conduct. To prevail on this issue, Rodgers must show not only that her defense was impeded by her not knowing Marrs's true identity, but that prejudice to her case resulted. Roviaro, 353 U.S. at 65. Rodgers's counsel ably cross-examined Marrs at trial despite his asserted lack of preparation, albeit to no evident avail. We therefore hold that the District Court did not abuse its discretion in denying Rodgers's motion.
 
 
 16
 3. Calculation of Rodgers's sentence.
 
 
 17
 With regard to sentencing under the Federal Guidelines, we review the District Court's findings of fact with great deference, 18 U.S.C. § 3742(d); United States v. Wilson, 878 F.2d 921, 922 (6th Cir.1989); the District Court's application of the Guidelines to those facts we review de novo. United States v. Edgecomb, 910 F.2d 1309, 1311 (6th Cir.1990).
 
 
 18
 The police found around fifty pounds of marijuana at the Perez and Villarreal homes, and held Rodgers responsible for the entire amount for sentencing purposes. Rodgers argues that she should be sentenced only for the twenty five pounds she arranged to deliver to Ballard and the additional pound she sold as a sample.
 
 
 19
 The amount of drugs involved in a given transaction is a matter of fact for the sentencing judge to find by a preponderance of the evidence. United States v. Hodges, 935 F.2d 766 (6th Cir.), cert. denied, 112 S.Ct. 251, 317 (1991). Where a conspiracy to sell drugs is alleged, the convict is accountable for the amount of drugs involved he knew about or reasonably should have known about. United States v. Blankenship, 954 F.2d 1224, 1228 (6th Cir.), cert. denied, 113 S.Ct. 288 (1992). The record supports the District Court's conclusion that Rodgers be sentenced for the entire fifty pounds of marijuana discovered. She told Ballard she could get him up to 150 pounds of marijuana, and that Perez's house was her "gingerbread house," indicating, as the term has been explained, that she knew the bulk of the supply was stored elsewhere nearby. The fact that most of the cash she took from Ballard for the "sample" was found at Villarreal's house further suggests she knew of the contraband found there. The District Court did not clearly err in sentencing Rodgers based on the entire stash.
 
 
 20
 4. Rodgers's sentencing.
 
 
 21
 Rodgers asserts that her entrapment defense should be considered tantamount to a guilty plea, and that the District Court should have adjusted her Guidelines offense level to reflect an acceptance of responsibility. While we have ruled that a sentencing judge is within his discretion in recognizing acceptance of responsibility where the entrapment defense has been unsuccessfully asserted, see United States v. Fleener, 900 F.2d 914 (6th Cir.1990), simply alleging entrapment does not entitle a defendant to the downward adjustment. Here, the judge concluded that Rodgers had not fully accepted responsibility, as the Guidelines require, since she "tried to pass that responsibility off to somebody else," namely Marrs, and had denied ever being involved in drug sales, an assertion which Perez had debunked. Since the record supports the District Court's conclusions, we find no error in this aspect of Rodgers's sentencing.
 
 
 22
 Rodgers also argues that the judge erred in opting not to grant a downward departure from the applicable Guidelines sentencing range. We have held downward departures from the Guidelines to be completely within the discretion of the sentencing court and therefore unappealable. United States v. Draper, 888 F.2d 1100 (6th Cir.1989).
 
 
 23
 5. Villarreal's sentencing.
 
 
 24
 As did Rodgers, Villarreal complains that he did not get an adjustment for acceptance of responsibility, since he pled guilty to all charges against him pursuant to a plea agreement. His argument has even less merit than does hers. Villarreal initially pled not guilty, and was released on bond. He soon found himself under arrest for additional drug dealing charges when police revealed him as a participant in an investigation of apparently unrelated trafficking. When thus caught for a second time, and charged with tax evasion to boot, he finally pled guilty. The District Court properly found that Villarreal's history showed no cessation of criminal activity and acceptance of responsibility as contemplated by the Guidelines.
 
 
 25
 Villarreal also was convicted of being a felon in possession of a firearm; he argues that the District Court erred in not calculating this violation as an enhancement of the drug violation base offense level rather than as a separate violation. As with most sentencing decisions, the District Court enjoys great latitude in making this application choice. The sentencing court did not enhance the drug sentence for use or possession of a firearm, as the Government points; thus, calculating the firearm sentence separately did not result in impermissible "double counting" under U.S.S.G. § 2D1.1.
 
 
 26
 For the reasons set forth above, the convictions and sentences of Janet Lois Baker Rodgers and Carlos David Villarreal are
 
 
 27
 AFFIRMED.
 
 
 
 *
 The Honorable Anna Diggs Taylor, of the Eastern District of Michigan, sitting by designation