27 F.3d 569
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gregory I. BELL, Defendant-Appellant.
 No. 93-3246.
 United States Court of Appeals, Seventh Circuit.
 Argued April 27, 1994.
Decided July 6, 1994.
 
 Before ESCHBACH, COFFEY and KANNE, Circuit Judges.
 
 ORDER
 
 1
 In 1993, Gregory I. Bell was indicted on three counts for the sale of cocaine to undercover United States Postal Inspectors Carmen Reese and Steven Franczyk on January 5, 7, and 14, 1988. 18 U.S.C. Sec. 841(a)(1). Dismissing Bell's contention that the government agents entrapped him, the district court adjudged him guilty on all counts. On appeal, Bell alleges that the district court applied the wrong legal standard for entrapment and that the government failed to prove beyond a reasonable doubt that he was predisposed to commit the offense. We affirm.
 
 
 2
 Entrapment is shown if the defendant was induced by the government to commit a crime he was not predisposed to commit. United States v. Gonzalez, 19 F.3d 1169, 1172 (7th Cir.1994). To prevail on appeal, Bell must prove that no rational trier of fact could conclude, based on the evidence presented at trial, that he was predisposed to distribute cocaine. Gonzalez, 19 F.3d at 1172; United States v. Sanders, 962 F.2d 660, 679 (7th Cir.), cert. denied, 113 S.Ct. 262 (1992).
 
 
 3
 To determine whether the defendant is predisposed to commit a crime, the district court may consider the following relevant factors:
 
 
 4
 (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government persuasion; and (5) the nature of the inducement or persuasion applied by the government.
 
 
 5
 Gonzalez, 19 F.3d at 1172; United States v. Santiago-Godinez, 12 F.3d 722, 727 (7th Cir.1993), cert. denied, 62 U.S.L.W. 3705 (1994). In addition, predisposition is established where--by reason of the defendant's previous training, experience, occupation, or acquaintances--it is likely that he would have been induced by someone else to commit the crime had the government not done so first. United States v. Hollingsworth, No. 92-2399, slip op. at 5-6 (7th Cir. June 2, 1994) (en banc).
 
 
 6
 Bell first argues that the district court relied on outdated legal precedent in deciding whether he had been entrapped. Citing United States v. Evans, the district court stated that an individual who is predisposed to commit a crime is one who takes advantage of an ordinary opportunity, not an extraordinary opportunity, to engage in criminal activity. 924 F.2d 714, 717 (7th Cir.1991). An extraordinary opportunity is one which would entice a law-abiding citizen. Id. Bell contends that in Jacobson v. United States, the Supreme Court enunciated a higher standard of proof than the "ordinary opportunity" test, holding that the government must prove a defendant's predisposition to commit a crime independent of the government's acts. 112 S.Ct. 1535, 1541 (1992).
 
 
 7
 Jacobson, however, is not inconsistent with Evans. The Supreme Court specifically states:
 
 
 8
 [A]n agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition.
 
 
 9
 Jacobson, 112 S.Ct. at 1541 (emphasis added). The Court then distinguished Jacobson from those types of cases because the defendant had only accepted the government's offer to receive child pornography through the mail after 26 months of continuous government pressure. Accordingly, Jacobson is merely an example of what Evans would characterize as an extraordinary opportunity, causing an otherwise law-abiding citizen to succumb to government pressure and engage in criminal activity he would not have the proclivity to commit independently. Jacobson, 112 S.Ct. at 1541. Based on the facts of this case, it is abundantly clear that Bell was not entrapped under both Jacobson and this court's recent decision in Hollingsworth.
 
 
 10
 On January 4, 1988, Bell met with Cedric Arrington, a former co-worker at the United States Post Office South Suburban facility, so that Arrington's "friend," Postal Inspector Franczyk, could buy cocaine. Arrington, an informant for the U.S. Postal Inspection Service, initiated the transaction:
 
 
 11
 Arrington (Arr.): I got 500 to throw down on the ya-yo.[1]
 
 
 12
 Bell: Aw, I ain't got it man.
 
 
 13
 Arr.: Take me to it, I need it right now, ol' boy's sprung, he don't even know what's happening.
 
 
 14
 Bell: I can't.
 
 
 15
 Arr.: Man, stop that, man I'm down here on the motherfuckers -----.
 
 
 16
 Bell: I understand, I can't help.
 
 
 17
 Loose Pleadings [hereinafter Loose Pl.] 1/4/88 at 10. After Arrington told Bell that Franczyk would be willing to pay up to $2400 for an ounce of cocaine, and that he had $500 on him right now to buy an 8-ball,[2] Bell agreed to see how much cocaine he could get:
 
 
 18
 Arr.: I wouldn't have brought the nigger down here if ----.
 
 
 19
 Bell: Well, let me go call Smoothie back at the job and see what he say, if he don't, man, all I can do is some 50 cent package[3] man.
 
 
 20
 * * *
 
 
 21
 Bell: How many you want?
 
 
 22
 Arr.: Cedric kicking ass man.
 
 
 23
 Bell: I see.
 
 
 24
 Arr.: Yo we talking at least, we talking 5 bills man, close that door over there man.
 
 
 25
 * * *
 
 
 26
 Franczyk: So what's, what's the game man, you got any shit or not?
 
 
 27
 Bell: Hey, I can do it, let me go back to the gig and make this one phone call.
 
 
 28
 Loose Pl. 1/4/88 at 13-14.
 
 
 29
 Arrington and his "girlfriend," undercover Postal Inspector Carmen Reese, met with Bell the next morning and gave him the number to the undercover phone at the main postal facility. Later that morning, Bell called and told Arrington that he could get some "nice 50 cent packages." They met that day, and Bell gave Reese six one-half gram packages of cocaine in exchange for $300. Although Bell asked for some of the cocaine, he was given $50 instead.
 
 
 30
 That afternoon, Bell called Arrington again and promptly agreed to sell him more cocaine. Bell called two more times that day and arrived at the pre-arranged time and meeting place for a second buy with Arrington and Franczyk at 3:45 p.m. Although Bell waited until 5:40 p.m. and made two additional phone calls to Reese, one at 5:40 p.m. and the other at 6:04 p.m., neither Arrington nor Franczyk showed up.
 
 
 31
 On January 7, Arrington called Bell for the first time. The second buy was consummated that day in a manner similar to the previous transaction. Franczyk received six one-half gram packages for $340. On January 13, Franczyk called Bell directly:
 
 
 32
 Franczyk: Hey, man, I, I'm, I'm not around now, but I think I can put some money together, man, and get to town tomorrow. You, uh, you think you'll be holding tomorrow?
 
 
 33
 Bell: Yeah.
 
 
 34
 Franczyk: Okay, uh ...
 
 
 35
 Bell: Same thing?
 
 
 36
 Franczyk: Yeah, yeah, that's, that's good, man.
 
 
 37
 Loose Pl. 1/13/88 at 2. They met again the following day, and Franczyk bought an additional six packages for $340. Shortly thereafter, Bell was arrested.
 
 
 38
 Based on Arrington's testimony, the district court found that Arrington and Bell had used cocaine as many as two or three times a week between March and September 1985, that Bell had supplied the drugs, and that they continued to use drugs together whenever they saw each other. Although Bell testified that he had used drugs with Arrington only once and that he bought the cocaine for Arrington and Franczyk with the intent to share it with them, the district court did not find his testimony credible. Given the district court's unique ability to observe the demeanor of witnesses and assess credibility, we find no reason to reject the district court's determination, especially where there is abundant evidence in the record to support the court's finding. Anderson v. Bessemer City, 470 U.S. 564, 575 (1985); United States v. Kozinski, 16 F.3d 795, 820 (7th Cir.1994) ("Any argument that the trial judge [in a bench trial] should have disbelieved a certain witness is 'doomed at the outset.' ") (quoting United States v. DeCorte, 851 F.2d 948, 953 (7th Cir.1988)).
 
 
 39
 The taped telephone records demonstrating Bell's knowledge of the terminology used to refer to the quantities in which cocaine is sold (i.e., ya-yo, 8-ball, and 50-cent packages), and the method used to increase the potential profit from cocaine by diluting it with other substances verify his familiarity with the logistics of drug dealing. Moreover, when Bell agreed to supply the cocaine, he knew exactly who to call and where to go to get the drugs. Santiago-Godinez, 12 F.3d at 730 (defendant who could procure cocaine from an independent source without any direction from the government demonstrated his predisposition). Thus, unlike the defendants in Hollingsworth, No. 92-2399, slip op. at 6, who had neither training, contacts, aptitude nor experience in international finance and who were unlikely to become involved in money laundering independent of the government's assistance, the evidence here indicates that Bell was not a newcomer to the drug trade. In fact, he possessed both the requisite knowledge and the contacts necessary to supply cocaine.
 
 
 40
 There is also no indication that the government agents exerted substantial pressure on Bell or that he was anything but willing to supply Arrington, Franczyk, and Reese with cocaine. Despite Bell's contention that he only agreed to supply the cocaine after he succumbed to the "relentless pressure" and personalized pleading by his friend Arrington, a reasonable trier of fact could have concluded otherwise.
 
 
 41
 Although Bell initially replied that he could not help Arrington and Franczyk buy cocaine, by the end of their first conversation on January 4, he agreed to see how much cocaine he could procure. Initial reluctance to supply cocaine to a government informant is insufficient to support an entrapment defense. United States v. Ortiz, 5 F.3d 288, 291 (7th Cir.1993) (even though taxicab driver told the informant that he would rather drive a cab than spend twenty years in prison, after a series of telephone calls he found a source, and one month later, sold drugs to the informant); United States v. Mahkimetas, 991 F.2d 379, 386 (7th Cir.1993) (no evidence of entrapment when moments after the defendant voiced doubts about supplying drugs, he agreed with his mother to contact his friends to find cocaine). Even if his source, Smoothie, could not find as much cocaine as Franczyk wanted, Bell knew he could supply Franczyk with numerous one-half gram packages. Although Joycie Jackson, Bell's girlfriend, stated that on January 5, Reese and Arrington each called her apartment five to six times looking for Bell, the taped telephone conversations indicate that Arrington did not call Bell until January 7, after the first transaction took place. Hence, the record contains more than enough evidence to establish Bell's willingness to supply cocaine to the government agents.
 
 
 42
 Finally, although Bell did not receive any monetary profit from the drug transactions, he readily admits that he expected to use some of the cocaine from each transaction with Reese and Franczyk to get high with them. Profits need not be monetary in nature, and Bell's statement indicates that he expected some type of benefit from his role as supplier for Reese and Franczyk.
 
 
 43
 Accordingly, Bell's predisposition to distribute cocaine is made evident by his willingness to supply the government agents with drugs through independent sources in exchange for a small amount of cocaine for his personal use. The district court's judgment is therefore AFFIRMED.
 
 
 
 [1]
 Term of art for cocaine. Tr. at 52
 
 
 [2]
 Term of art for an eighth of an ounce of cocaine. Tr. at 58
 
 
 [3]
 Term of art for a one-half gram package of cocaine. Tr. at 58