Ethel GREEN, Appellant,
(Defendant Below),

v.

STATE of Indiana, Appellee,
(Plaintiff Below).

No. 76A03–9007–CR–237.

Court of Appeals of Indiana,
Third District.

July 22, 1991.

Rehearing Denied Oct. 2, 1991.

Randy Coffey, Angola, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

HOFFMAN, Presiding Judge.

Defendant-appellant Ethel Green brings a direct appeal of her March 1990 conviction for conspiracy to commit murder, a Class A felony. In April 1990 Ethel was sentenced to a determinate term of 24 years imprisonment.

On appeal, Ethel raises seven issues for review. As restated, the issues are:

(1) whether the trial court erred in determining that the charging information for conspiracy to commit murder suf-

ficiently apprised Ethel of the nature of the charges against her;

(2) whether the trial court erred in failing to suppress certain evidence viewed by police prior to Ethel's written consent to search her home;

(3) whether the trial court erred in determining that Ethel's statement to police was voluntary;

(4) whether the trial court erred in failing to dismiss the charges against Ethel due to the State's failure to timely meet ordered discovery deadlines;

(5) whether the trial court erred in granting a motion *in limine* as to the use of polygraph evidence;

(6) whether the trial court erred in allowing a State's witness to relate portions of a statement by Ethel's daughter who refused to testify; and

(7) whether Ethel's conviction is supported by sufficient evidence.

The evidence most favorable to the verdict discloses that in 1989 Ethel's daughter, Brenda, began dating Ronnie Dean Conley. Ethel's husband, Clinton, disapproved of the relationship between Brenda and Ronnie. Between Thanksgiving and Christmas 1989, Ethel, who did not disapprove of the relationship, spoke to Ronnie about killing Clinton because he mistreated her and Brenda.

Over the Christmas or New Year holiday, Ethel assisted in secreting Ronnie in Brenda's bedroom over a four-day period. Ethel again requested Ronnie's assistance in killing Clinton. Ethel asked to borrow Ronnie's shotgun.

On January 4, 1990, Ronnie decided to assist Ethel by providing her with the shotgun. That evening Ronnie placed the shotgun in his car prior to driving to the Green residence. Ronnie used a pre-arranged signal to inform Brenda that he had arrived. Brenda and Ronnie returned to the Green house a few hours later. Upon their arrival at the Green house, Brenda determined that everyone was asleep. Brenda awakened Ethel. Ronnie gave Ethel the shotgun in the kitchen of the home. Ethel left the kitchen with the shotgun. Shortly thereafter, Ronnie heard two shots. Ethel returned to the kitchen and gave the shotgun to Ronnie. Ronnie immediately left the premises.

Ethel's son, Larry, awoke and ran to a neighbor's home to report that his father had been shot. The neighbor called the police. When the police and emergency medical personnel arrived they determined that Clinton had sustained a gunshot wound to his neck. Clinton was dead.

Larry told police that he was awakened when he heard shots. He looked into the bedroom and saw that his father had been shot. He told his mother not to enter the bedroom. He then ran to the neighbors' home to call police. Larry also told police that he believed Ronnie Conley shot his father. Larry indicated that his father forbade Ronnie from seeing his sister, Brenda Green.

After Steuben County sheriff's officials, Steuben County emergency medical technicians, and Indiana State Police officers began arriving at the scene, the Greens were escorted to the neighbors' home. The officers made a visual inspection of the interior and exterior of the home. Two Indiana State Police officers began taking photographs of the scene. They also began a sketch of the scene. In the photographs and sketch, the officers included the shotgun wadding, pellets embedded in the ceiling, and a hole in the bedroom window.

Once it was determined that a homicide investigation would be conducted, a consent to search was obtained from Ethel at the neighbors' home. After the consent was signed, the officers conducted a thorough search of the premises.

Ethel, Brenda and Ronnie were arrested on a variety of charges. Ronnie accepted a plea agreement and testified at Ethel's trial which was held over a four-day period in March 1990. Ethel was convicted of conspiracy to commit murder, and as noted above she was sentenced to a determinate 24–year prison term. This appeal ensued.

First, Ethel contends that the charging information for conspiracy to commit mur-

der did not sufficiently apprise her of the nature of the charge. In pertinent part the information provides:

"DONALD P. SHIVELY, BEING FIRST DULY APPRISED OF THE PENALTIES FOR PERJURY, AFFIRMS that on or about the 5th day of JANUARY, 1990, at and in the County of Steuben and State of Indiana, one ETHEL GREEN did then and there agree with other persons, to-wit: Brenda Green and Ronnie Conley, to commit Murder, a felony, specifically to unlawfully kill another human being, to-wit: Clinton Green, and that Ronnie Conley performed an overt act in furtherance of the agreement, by bringing to the Green residence a shotgun to be used in the killing of Clinton Green, and that either Ronnie Conley or Ethel Green performed an overt act in furtherance of the agreement by killing Clinton Green."

 The purpose of an information is to apprise the defendant of the particular crime charged, thereby allowing her to prepare a defense. *Cash v. State* (1990), Ind., 557 N.E.2d 1023, 1025. Absence of detail in an information is fatal only if the phraseology misleads the defendant or fails to give her notice of the pending charges. *Id.* An information or indictment charging conspiracy must describe the intended felony with the same certainty and particularity as an indictment for commission of the felony. *Heiny v. State* (1980), Ind.App., 405 N.E.2d 548, 549–550. "Moreover, a charge of conspiracy in an indictment or an information 'need only be so certain and particular as to enable the accused, the court and the jury to determine the crime for which conviction is sought.' [Citation omitted.]" *Brown v. State* (1980), Ind. App., 403 N.E.2d 901, 908.

 The information in the present case sufficiently apprised Ethel of the alleged conspiracy and the essential elements of the murder charge allowing her to prepare a defense. The trial court did not err in denying her motion to dismiss the charge.

Next, Ethel contends that certain evidence viewed at the scene of the murder, which was her home as well as the victim's,

must be suppressed inasmuch as the police officers viewed the evidence prior to her execution of a consent to search. Ethel alleges a violation of her Fourth Amendment rights ensuring against illegal searches and seizures.

"A search conducted without a warrant issued upon probable cause is *per se* unreasonable." *State v. Jorgensen* (1988), Ind. App., 526 N.E.2d 1004, 1005, citing *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. However, the rule is subject to well defined exceptions. *Id.* One of the specifically established exceptions to the warrant and probable cause requirements is a search conducted pursuant to consent. *Id.*

Ethel relies in large part upon *Jorgensen, supra,* in which this Court determined that a four-hour search of the defendant's home, the scene of a homicide, was unreasonable inasmuch as the defendant's acquiescence was pursuant to a claim of lawful authority by police officials. In *Jorgensen* the police suggested that the defendant should go with her father-in-law while a search was conducted and evidence was gathered. The Court rejected the State's argument that the defendant's failure to object to the search constituted acquiescence. *Id.,* 526 N.E.2d at 1007. Neither a valid consent to search nor a valid search warrant were obtained. *Id.* at 1006–1008.

In *Mincey v. Arizona* (1978), 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, the court determined that the Fourth Amendment does not bar police from warrantless entries and searches when they reasonably believe a person within is in need of immediate attention. The court stated further, "[s]imilarly when the police come upon a scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Id.* The need to preserve or protect life justifies what would otherwise be illegal if exigency or emergency did not exist. *Id.* Further, police may seize items in plain view discovered during emergency activities. *Id.* at 393, 98 S.Ct. at 2413.

In the present case it is not without significance that the police agencies were summoned to the scene of a shooting. The police had probable cause to enter the home and make a prompt warrantless search of the area to preserve or protect life. Although the officers began photographing and sketching the scene approximately one hour prior to obtaining a consent to search from Ethel, that limited preservation of evidence included only items in plain view. Neither the express purpose nor the spirit of the Fourth Amendment, as interpreted in the foregoing cases, was violated by the officer's actions. In contrast to *Jorgensen* and *Mincey*, a valid consent was executed prior to a search of the premises. The trial court properly denied Ethel's motion to suppress the evidence viewed prior to execution of the consent to search.

Next, Ethel contends that her most damaging statement to police was involuntary, thereby violating her Fifth Amendment right to remain silent and her Sixth Amendment right to an attorney. Ethel gave several statements to police after Clinton's death. On January 10, 1990, Ethel was arrested. After a recitation of her rights, the following conversation took place:

"OFFICER STACEY: Okay. I need your signature on this form here, if you will, and all it says is we're gonna ask you some questions. You don't even have to talk to us at all.

ETHEL GREEN: I don't care to talk to you.

OFFICER STACEY: You don't want to talk to us?

ETHEL GREEN: I don't care to but ...

OFFICER STACEY: Okay. So ...

ETHEL GREEN: But I talked to you the last time and I told you everything I know.

OFFICER STACEY: All right, okay. We're gonna go through it step by step again.

ETHEL GREEN: I don't want this happenin' again. We've gone through the same thing. They just keep a askin' me the same questions.

OFFICER STACEY: Okay. I told you because we found a couple of little areas there that we need to get clarified, okay? Obviously you got a problem or you wouldn't be sittin' where you're at today arrested for murder.

ETHEL GREEN: I didn't do it.

OFFICER STACEY: Okay.

ETHEL GREEN: I told ya what I told ya.

OFFICER STACEY: All right. Then you want to cooperate with us and get it out, what you know, so you can help us finish out this investigation, okay? Are you clear on your rights, that you have these rights? You don't have to talk to us but you will today? Is that what you're saying?

(No audible response heard)

OFFICER STACEY: I need you to sign this form here if you will. Right there where the 'X' is, right here. That says that we've read this to you and explained it to you and we're gonna be askin' you questions pertaining to this shooting of Clinton Green...."

Ethel then signed the form. Ethel gave an incriminating statement which differed from Ronnie's trial testimony in many respects including as to who actually killed Clinton. However, in the statement Ethel admitted that she knew Ronnie was going to kill Clinton and that she watched.

At the hearing on Ethel's motion to suppress the statement, the police officers in attendance at the time of the statement testified as to the circumstances which convinced them that Ethel did not intend to invoke her right to remain silent. The officers testified that her responses caused some confusion because she nodded affirmatively and appeared as though she wished to waive her right to silence; yet, the statement "I don't care to" seemed to be a negative response. Both officers present believed that Ethel intended an affirmative answer. Moreover, Ethel's son, Gary, and other family members testified that in Ethel's colloquial manner of speaking, the phrase "I don't care to" is tantamount to having no objection.

In a challenge to the admissibility of a confession, the State has the burden of

proving beyond a reasonable doubt that the defendant intelligently and knowingly waived her rights to not incriminate herself and to have an attorney present. *Ingram v. State* (1989), Ind., 547 N.E.2d 823, 825. Review of a trial court's ruling on the admissibility of a confession requires examination of the evidence before the trial court that supports its ruling. *Lowery v. State* (1989), Ind., 547 N.E.2d 1046, 1050, cert. den., — U.S. —, 111 S.Ct. 217, 112 L.Ed.2d 176. If the trial court's determination is supported by substantial evidence of probative value, it will not be disturbed. *Id.* The standard of review is the same as in other sufficiency matters, that is the court will not weigh the evidence. *Id.*

■ Ethel contends that the present situation is akin to the cases in which a defendant explicitly invokes the right to remain silent. *Cf. Benton v. State* (1980), 273 Ind. 34, 401 N.E.2d 697, 698 (under the circumstances, once defendant refused to sign waiver of rights form explicit refusal required officers to refrain from further questioning). Here, Ethel did sign the waiver of rights but she argues the document was executed after her explicit refusal to speak further with the officers. Ethel asserts that her statements, "I don't care to," and "I don't want this happenin' again" are not ambiguous; thus, the officers were required to cease questioning. It is true that the signing of a waiver of rights form does not conclusively demonstrate a valid waiver. *McFarland v. State* (1988), Ind., 519 N.E.2d 528, 530. However looking at all the circumstances, it must be determined whether the defendant freely and voluntarily confessed absent inducement by threats or improper influences. *Id.*

■ Contrary to Ethel's contention, based upon the evidence available to the trial court an explicit refusal to waive her rights did not occur. Her colloquial manner of speaking coupled with her apparent willingness to speak with the officers created an ambiguity subjecting her statements to interpretation. The officers' further questioning appeared to be directed toward clarifying her intent, not to elicit incriminating statements. The interview did not proceed on substantive matters until the officers were satisfied that Ethel understood her rights and voluntarily waived them by executing the waiver form. Under the appropriate standard of review, viewing the evidence most favorable to the trial court's determination, the evidence supports a finding that Ethel's statement was voluntarily given.

Ethel complains that the State failed to fully cooperate in supplying discovery material which resulted in a denial of her right to a fair trial. Ethel claims surprise based upon evidence admitted at trial which was not supplied during discovery. Specifically, Ethel alleges that she was prejudiced by enlarged pictures of the crime scene, a tape recording which prior to trial she believed was inaudible, and a tape recording of a statement by Brenda. Ethel contends that the State's late filing of some discovery material hindered preparation of her defense.

■ Pretrial discovery is designed to promote justice and to prevent unfair surprise by allowing adequate time for the preparation of the defendant's case. *Phillips v. State* (1990), Ind., 550 N.E.2d 1290, 1299. A trial court's determination whether discovery tendered constitutes substantial compliance with its discovery orders is reviewed deferentially and may be reversed only on a showing of clear error. *Id.* A trial court's choice of remedy for a violation of a discovery order is discretionary and reviewable only for an abuse of that discretion. *Id.* Absent a showing that the prosecution engaged in deliberate or other reprehensible conduct thereby thwarting the defendant's right to a fair trial, exclusion of evidence is not a proper sanction. *Id.* Where remedial measures are warranted, usually a continuance is proper. *Jaske v. State* (1989), Ind., 539 N.E.2d 14, 20.

■ Because the trial in this cause occurred slightly more than two months after the crime, both parties were laboring under investigation and preparation time constraints. Hearings on discovery matters did not reveal an intent by the State to thwart preparation of Ethel's defense. Further, it is not apparent that Ethel was prejudiced by the State's failure to meet all discovery deadlines imposed by the court.

Ethel does not specifically claim nor does a review of the record reveal that she requested a continuance at trial when the items referenced above were introduced. Ethel objected to admission of enlarged photographs of the crime scene based upon her belief that smaller photographs would be employed by the State. The trial court found no prejudice to Ethel in that enlargement of the same photos that she had received in discovery would not alter preparation of her case. Similarly, Ethel did not attempt to show that earlier discovery compliance as to the tapes would have altered her trial preparation. The trial court did not err in its determination as to discovery sanctions.

Next, Ethel alleges error in the trial court's granting of a motion *in limine* proffered by the State as to any evidence of polygraph examinations taken by Ethel, Brenda and Ronnie. At trial, a State's witness mentioned the polygraph examinations twice. After the last incident a bench conference was held wherein Ethel's attorney did not seek to introduce evidence of the polygraph examinations. The attorney believed that an instruction would adequately resolve the issue for the jury.

It is well settled in Indiana that evidence of polygraph examinations is not admissible absent a stipulation or waiver by all parties. *Johnson v. State* (1985), Ind., 472 N.E.2d 892, 908. Also, the granting of a motion *in limine* preserves no issue on appeal, and the failure to offer the excluded evidence at trial constitutes waiver of the issue. *Kindred v. State* (1989), Ind., 540 N.E.2d 1161, 1186. No error is presented.

Ethel argues that the trial court erred in allowing a State's witness to relate portions of a taped statement by Brenda. At trial Ethel objected to the statement as hearsay. Because the statement was not introduced for the truth of the matters asserted, but only as evidence that Brenda gave a statement the trial court ruled in favor of its admissibility on the grounds that the statement did not constitute hearsay. In the brief of appellant, Ethel contends that regardless of its hearsay status, the statement was inadmissible because it violated her Sixth Amendment right of confrontation because Brenda refused to testify at the trial.

Ethel correctly notes that it is error to introduce into evidence a nontestifying codefendant's confession which is inculpatory of the defendant because it violates the defendant's Sixth Amendment right to confront witnesses against him. *Zachary v. State* (1984), Ind., 469 N.E.2d 744, 748. "However, our cases have consistently held that it is harmless error to admit a codefendant's confession where the defendant's own confession has been admitted and does not differ substantially from that of his confederate. [Citations omitted.]" *Id.* Here, Ethel makes no argument as to the inculpatory nature of Brenda's statement or whether Brenda's statement differed in any regard from Ethel's statement which was admitted into evidence. No error is presented.

Finally, Ethel contends that insufficient evidence supports the jury's guilty verdict. When faced with a challenge to the sufficiency of the evidence, courts on review will neither weigh the evidence nor judge the credibility of witnesses and will consider only the probative evidence and reasonable inferences supporting the verdict. *Braswell v. State* (1990), Ind., 550 N.E.2d 1280, 1284. Here, the jury was presented with evidence that Ethel, Brenda and Ronnie conspired to kill Clinton Green. Ethel procured Ronnie's assistance through claims that Clinton was abusing her and Brenda. Ronnie's testimony regarding the events was partially corroborated by a co-worker to whom Ronnie confided prior to the killing. At trial the jury was presented with some evidence of a monetary motive for the killing. The evidence adequately supports the verdict.

There being no finding of reversible error, the judgment of conviction is affirmed.

Affirmed.

CONOVER and STATON, JJ., concur.