Ted H. **DRIVER**, Appellant–Defendant,

v.

**STATE of Indiana**, Appellee–Plaintiff.

No. 34A02–9106–CR–253.[1]

Court of Appeals of Indiana,
First District.

June 24, 1992.

Transfer Denied Aug. 28, 1992.

---

**1.** This case was reassigned to this office on April 30, 1992 by direction of the Chief Judge.

Caroline B. Briggs, Flora, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

ROBERTSON, Judge.

Ted H. Driver appeals from his jury trial conviction of dealing in a Schedule I, II, or III controlled substance as a class B felony. He raises four allegations of error. Because we reverse, we will address only those errors which mandate reversal or which affect retrial:

I.   whether the defendant was denied his right to be present at trial, right to confront and cross-examine witnesses, and right to counsel when the Court permitted the State to introduce prior testimony taken in the defendant's absence;

II.   whether the defendant's trial violated the mandates of Criminal Rule 4(C);

III.   whether external influences and communications with the jury during deliberations deprived the defendant of a fair trial.

I

■   Driver received a new trial because he had not knowingly, intelligently, and voluntarily waived his right to be present at his first trial.   On retrial, the trial court admitted testimony of a police officer who was dead by the time Driver was retried but who had testified at the first trial. Essentially, the officer had stated that, after his arrest, Driver had admitted he had given or had allowed the informant to take some Percodan (oxycoidane) pills which had been in Driver's possession and for which he had had a prescription.

Driver claims that, because he was not present at his first trial and because he had not validly waived that right, the use of the prior testimony was improper: he was not present to confront the witnesses; he was not present to consult with counsel; he was not present to aid counsel in cross-examination.   Because a section of the Indiana Constitution would prevent the admission of the testimony on retrial, we will address only the confrontation allegation related to that section.

Article I, § 13 of the Indiana Constitution provides: "[I]n all criminal prosecutions, the accused shall have the right ... to meet the witnesses face to face." *Brady v. State* (1991), Ind., 575 N.E.2d 981, 986.

Of the various meanings which this phrase undoubtedly has in context with the rest of Article I, § 13 and in law, its literal meaning is primary, unmistakable,

and dominant. A face-to-face meeting occurs when persons are positioned in the presence of one another so as to permit each to see and recognize the other. While the language employed in Article I, § 13 of our Indiana Bill of Rights has much the same meaning and history as that employed in the Sixth Amendment, it has a special concreteness and is more detailed ... The right is not absolute. It is secured where the testimony of a witness at a former hearing or trial on the same case is reproduced and admitted, where the defendant either cross-examined such witness or was afforded an opportunity to do so, and the witness cannot be brought to testify again because he has died, become insane, or is permanently or indefinitely absent from the state and is therefore beyond the jurisdiction of the court in which the case is pending. In such cases, there has been a prior face-to-face meeting with the opportunity to cross-examine the witness before a trier of fact in the same case and a necessity for the production of testimony exists.

*Id.* at 987. (Citation omitted.) While the right to cross-examination may be the primary interest protected by the confrontation right in Article I, § 13, the defendant's right to meet the witnesses face-to-face has not been subsumed by the right to cross examination. *Id.*

In this case, Driver did not knowingly, intelligently, and voluntarily waive his right to be present at his first trial. A police officer testified at that trial, and counsel for Driver cross-examined him. Driver, however, did not meet the officer face-to-face at trial. We must conclude he had no opportunity to do so because he did not validly waive his right to be present to do so. The officer's testimony was reproduced and admitted at the second trial. The police officer was dead by the time of retrial and obviously could not be brought to testify again so a necessity for the production of the testimony existed. However, there was "no person or body interposed between the witness and the accused" such that "a face-to-face meeting as contemplated by the Constitution" occurred at any time. *Id.* at 989.

In addition, we cannot find the admission of the testimony to be harmless. Essentially, the officer had stated that Driver had admitted he had given the confidential informant the Percodan. The evidence otherwise showed that the informant, who admitted having dealt Percodan in the past, was not searched before he engaged in the "controlled buy" with Driver at a bar. The informant had begun to work for the police when faced with the possibility of an habitual offender enhancement. At the bar, police officers saw something pass from Driver to the informant but could not tell what it was. The informant left the bar with the police officers; and they engaged in another drug transaction, went to another bar, and then returned to the first bar. Only then did the informant give the officers the Percodan, which he claimed to have received earlier from Driver. The officers gave the informant money to give to Driver. Once inside the bar again, the confidential informant went into the back room, out of the sight of the officers. The police officers did not see the confidential informant give Driver the money, as he claimed to have done.

The strongest evidence against Driver came from an admitted Percodan drug dealer who, in light of a possible charge of habitual offender, could be said to have been motivated to produce results for the police. The police officers did not search him before the "controlled" buy, did not obtain the drugs purportedly received from Driver until other intervening events occurred, and did not see either the drugs or the money pass between the two. From the officers' viewpoint, they arrived at the bar where the informant was present, saw something pass between Driver and the informant at one point, and received Percodan from the informant sometime later. The informant stated that Driver had sold him the substance. The State bolstered this evidence with the dead police officer's testimony about Driver's admission, which

enhanced the confidential informant's credibility.

The dead police officer's testimony about Driver's admission, introduced at Driver's second trial, however, should not have been admitted; and, therefore, the informant's credibility was erroneously enhanced. After having pondered all of the evidence, we cannot conclude there is not a substantial likelihood that the erroneous evidence contributed to the verdict. *Bowman v. State* (1991), Ind., 577 N.E.2d 569, 571. This is true even though, absent the erroneous evidence, the evidence would have been sufficient to support the conviction. *Id.* (citing *Kotteakos v. United States* (1946), 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557).

## II.

Driver claims his trial violated the mandates of Ind.Crim.Rule 4(C), in that his retrial did not occur within a year after he was granted a new trial. We address this issue because, if correct, he is presently beyond the limits of the Rule and may not be retried.

The trial court granted Driver a new trial on April 25, 1989, pursuant to remand for a hearing from our supreme court. The retrial by jury commenced on August 13, 1990, over one year later. Driver claims this delay violates Crim.R. 4(C), which states:

> No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as under subdivision (A) of this rule. Any defendant so held shall, on motion, be discharged.

Driver and the State both volley several contentions to show whether the defense, the prosecution, or the court caused delay from the grant of the new trial until the new trial began and whether Driver's request for discharge was sufficient under the Rule. Driver does not dispute, however, that the State initially brought him to trial within the mandates of Crim.R. 4.

This situation is analogous to that contemplated by *State ex rel. Brumfield v. Perry Circuit Court* (1981), Ind., 426 N.E.2d 692, cited by the State. There, our supreme court found that Crim.R. 4(C) does not apply to circumstances of a hung jury and mistrial:

> It is obvious that Ind.R.Crim.P. 4 does not anticipate mistrials. The rule speaks in terms of the time allowed the state to bring a defendant to trial—not to convict him. In the case before us, the defendant was brought to trial within the prescribed period of time under the rule. The rule does not specify how much time is reasonable following a mistrial by reason of a hung jury. Until such a rule is adopted, the only limitation is a "reasonable time."

426 N.E.2d at 695.

Likewise, Crim.R. 4(C) obviously does not anticipate a retrial after remand for a hearing. As noted, Driver does not dispute that the State initially brought him to trial within the mandates of Crim.R. 4. The trial court ordered a new trial in April of 1989, and our supreme court dismissed Driver's appeal in May of that year. Before retrial, the trial judge recused himself and Driver obtained new counsel. Driver did not object, based upon his speedy trial right, to the proceedings until March of 1990, and trial commenced in August.

The State initially brought Driver to trial within the rule. Driver appealed and a new trial resulted. The delay in obtaining a conviction on retrial was due to Driver's appeal, just as any delay resulting from the instant reversal will be due to the instant appeal. We do not fault Driver for appealing his conviction; we merely state that the reason for delay after he was initially brought to trial is due to his own action.

*See Harrison v. United States* (1968), 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (contention that petitioner denied right to speedy trial wholly without merit and properly rejected where virtually all delays (three trials and convictions, one vacation and one reversal on appeals) of which petitioner complained occurred in the course of appellate proceedings and resulted either from actions of petitioner or from the need to assure careful review of an unusually complex case). Also, Driver asserted his speedy trial right eleven months after the trial court ordered a new trial and he was retried only five months later. Finally, the only prejudice Driver identifies from the delay is that the police officer, whose previous testimony the trial court admitted on retrial, had died. We determined above that this testimony should not have been admitted in any event. In sum, we do not conclude the State did not bring Driver to retrial within a reasonable time. The Constitution of the United States appears to guarantee an early and proper disposition of the charges, not mere speed. See *United States v. Marion* (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468. Driver has been and continues to be given such an early and proper disposition.

### III.

The following discussion occurred after the trial court had given the jury its final instructions:

> [THE COURT]: The other matter, while we're still on record, I have followed the normal procedure of the presiding Judge of the Howard Circuit Court. During the process of my reading the instructions to the jury an independent recording was made so that if the jury requests the instructions we do not have to send them a blank copy. They can be given that tape with the further instruction

that if they wish to refer to the instructions they are to refer to all.

> MISS BRIGGS: I'll object to that.

> [THE COURT]: Right now I'm not sending it back because so far they haven't asked for anything. I haven't sent it back yet but I wanted counsel to be aware of it …

■■■ Driver alleges that the jury actually received the tape of the final jury instructions. He supports this claim through an affidavit of one of the jurors. The State responds that we may not consider the contents of this affidavit because juror affidavits may not be used to impeach a jury's verdict. We note, however, that although a juror may not impeach her verdict, she may give testimony about what transpired during the trial, including the deliberations. *Harrison v. State* (1991), Ind.App., 575 N.E.2d 642, 647 (quoting *Fox v. State* (1984), Ind., 457 N.E.2d 1088, 1093–1094 (citing *Mattox v. United States* (1892), 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917)). A juror may testify about any facts which bear upon the question of the existence of any extraneous influence although not about how far that influence operated upon her mind. *Id.* (quoting *Mattox*, 146 U.S. at 149, 13 S.Ct. at 53).

The juror's affidavit relates the following facts with regard to exposure to extraneous material[2]:

> I, Durinda Durham, being duly sworn, depose and say:
>
> \*   \*   \*   \*   \*   \*
>
> (2) That two jury questions were given to the bailiff, and the questions had to do with some terms that the jury needed to have interpreted, and the bailiff was called in and given the questions.
>
> (3) The bailiff left with the questions and then they were brought back to the jury by the bailiff. I think the questions were thrown away in the jury room.

**2.** We will not consider that portion of the affidavit which attempts to explain how far the influence operated upon the minds of the jurors:

(17) I know Ted would have been found innocent if the tape of the instructions wouldn't have come back to the jury room. At first the jury was evenly split on a verdict and the replaying of the tape over and over caused others to change their mind quickly. When the instructions came back, and the people were changing their minds one of them said this was meant to be. God meant for those instructions to come back here. And I thought I bet Ted wouldn't think of it like that.

(4) A tape of the jury instructions was given by the bailiff to the jury, after the jury asked the bailiff the questions.

\* \* \* \* \* \*

(6) After we got the tape the tape was replayed over and over again.

(7) We replayed parts of the tape over and over without playing the whole tape from beginning to end.

(8) We were not given any instructions by the judge about the tape. (The bailiff just brought the tape in to us. He acted surprised that we had not been given the tape earlier by the judge.)

The record is unclear about whether the trial judge was even aware that the jury had had questions or that the bailiff had given the jury the tape. The jury began its deliberations at 1:36 a.m., and the trial judge denied defense counsel's request that the jury be sequestered and put into a hotel room at 4:00 a.m. At 7:00 a.m., the jury indicated it had reached a verdict. After a discussion about how late the deliberations had lasted and how tired the jurors might be, the trial judge stated:

> They have made no request of the court. That is what I want to make clear, that they have made no request of the court in any way.

Driver brought this issue to the trial court's attention in his motion to correct error.

■ When communication between a bailiff and a jury occurs outside of the defendant's presence, there is a presumption of harm to the defendant that the State must rebut to avoid reversal. *See Wilson v. State* (1987), Ind., 511 N.E.2d 1014, 1018. The State may, however, avoid reversal if we are satisfied that no harm or prejudice resulted from the communication. *Id.*

■ The information before us shows that the jury gave two questions to the bailiff. The questions dealt with "some terms that the jury needed to have interpreted." The questions are not in the record so we cannot determine whether the "terms" which needed to be "interpreted" could actually have been answered by the final instructions. Inasmuch as this case involves an improper communication to the jury, the rebuttable presumption of prejudice prevents us from presuming that the absent questions were actually requests for the instructions to be reread or given to the jury. Without an affirmative showing of such requests, reversible error occurred when the bailiff gave the tape of the final instructions to the jury. The bailiff could just as easily have misinterpreted the questions and here erroneously concluded that the final instructions would answer them. Here, the trial judge, not the bailiff, should have directed the response. If that response were to reread the instructions, the proper procedure for that event is explained in *Lewis v. State* (1981), Ind., 424 N.E.2d 107. *See Cornett v. State* (1982), Ind., 436 N.E.2d 765. *Cf. Denton v. State* (1986), Ind., 496 N.E.2d 576. The presumption of harm stands, and the case is reversed for retrial.

Judgment reversed, and the cause is remanded for a new trial.

RATLIFF, C.J., and BARTEAU, J., concur.