Farrell Donald **GRANT**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee.

No. 34A02–9203–CR–105.

Court of Appeals of Indiana, Second District.

Nov. 16, 1993.

Rehearing Denied Jan. 10, 1994.

Caroline B. Briggs, Flora, for appellant-defendant.

Linley E. Pearson, Atty. Gen. of Indiana and Louis E. Ransdell, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

On November 12, 1991, a jury found Farrell Donald Grant guilty of Conspiracy to Commit Dealing in Cocaine or a Narcotic Drug, a Class A felony.[1] Grant presents several issues upon appeal which are restated as follows:

I. Whether the amended information sufficiently sets forth the elements of the offense charged;

II. whether the trial court erred in denying Grant's discovery requests;

III. whether the trial court erred in permitting the State to present the concept of "all reasonable doubt" during voir dire;

IV. whether the trial court erred in refusing Grant's tendered instructions and in giving the State's instruction upon the inference of conspiracy;

V. whether the trial court's *ex parte* communication with the jury was harmless error; and

VI. whether the evidence of Grant's predisposition was sufficient to negate Grant's entrapment defense?

We affirm.

The evidence most favorable to the conviction reveals that Grant agreed to participate in an illegal cocaine transaction. The trio involved in the plan included Grant, Gary Brian Hudson, a narcotics officer with the Bureau of Narcotic Enforcement of the California Department of Justice, and Larry Eugene Mote, an undercover officer with the Indiana State Police. During the course of on-going California investigations, Hudson learned that Grant had sold cocaine supplied by Becky Smith. Becky, who worked with Hudson as an informant subsequent to her 1988 drug-related arrest, "fronted"[2] cocaine to Grant from 1987 through June 1989. Grant generated a substantial debt to Becky under this arrangement.

In the spring of 1990, Becky contacted Grant, demanded repayment of the debt, and instructed him to call Hudson. Grant believed Hudson was Becky's main supplier. During a series of eleven telephone conversations, Hudson learned that Grant could sell one to two kilos of cocaine per week and that Grant would introduce him to additional buyers in Texas. After turn-

---

1. I.C. 35–41–5–2 (Burns Code Ed.1985) (Conspiracy); I.C. 35–48–4–1(a)(2) (Burns Code Ed.Supp. 1992) (Dealing in Cocaine or Narcotic Drug).

2. A "front" is an arrangement where a drug dealer gives drugs to a buyer and the buyer repays the dealer at a later date.

ing the case over to the Indiana State Police, Hudson assisted Officer Mote in setting-up a controlled buy.

Officer Mote, posing as Hudson's "runner," engineered the buy. Mote met Grant on May 24, 1990, to discuss potential cocaine purchases. Grant indicated that he needed to gather funds to further the transaction. Between May 24 and June 12, Grant contacted Hudson and Mote at least a dozen times, eventually informing them that he had collected the funds and wished to purchase a kilo of cocaine. Mote and Grant finalized the deal in Kokomo on June 12, 1990. Grant was arrested after exchanging a $4050.00 downpayment for a package allegedly containing cocaine.

## I. *Amended Information*

Grant alleges the amended information was vague and failed to set forth the elements of the charge with specificity. Grant contends the deficiency deprived him of due process and prevented adequate preparation of his defense. An information alleging a conspiracy must describe the intended felony with the certainty and particularity required for an indictment for commission of the intended felony. *Green v. State* (1991) 3d Dist.Ind.App., 575 N.E.2d 296, 299, *trans. denied.* An information that enables "the accused, the court and the jury to determine the crime for which conviction is sought" satisfies due process. *Id.*

Here, the State's information, amended subsequent to Grant's Motion for a More Definite Statement, adequately sets forth the required elements. First, the amended information alleged that Grant knowingly or intentionally intended to deal cocaine or a narcotic drug and that Grant agreed with Mote to commit dealing. Second, the

amended information set forth acts in furtherance of the conspiracy which included: (1) that Grant traveled to Kokomo and told Mote he wanted to purchase cocaine in excess of three grams; (2) that Grant agreed to pay Mote a $5,000 downpayment for a kilo of cocaine; (3) that Grant telephoned Mote and agreed to conduct the purchase of the cocaine on June 2, 1990 and; (4) that Grant and Mote completed an exchange of U.S. currency for the purchase of one kilo of a substance purported to be cocaine on June 12, 1990.

The acts set forth above substantially comply with the elements of conspiracy to deal cocaine or a narcotic drug pursuant to I.C. 35–41–5–2 and I.C. 35–48–4–1(a)(2). At trial, Grant presented testimony to refute the alleged conspiratorial nature of his actions. Further, Grant presented evidence relative to the alleged cocaine transaction. Grant was able to prepare and present a competent defense based upon the wording of the information. I.C. 35–34–1–2 (Burns Code Ed.1985) (charge must substantially comply with and track the words or meaning of the statute). The amended information sufficiently conveyed the charges for which Grant's conviction was sought.

## II. *Discovery*

Grant contends that the trial court's refusal to compel discovery of exculpatory evidence [3] and other information regarding Becky Smith was error. Citing *Jorgensen, supra* and *Burst v. State* (1986) 4th Dist. Ind.App., 499 N.E.2d 1140, *trans. denied,* Grant argues that his preparation and presentation of an entrapment defense was prejudicially hampered by the trial court's refusal to compel Becky's deposition or to subpoena her telephone records. The State

---

**3.** Although the State recognized its on-going duty to disclose exculpatory evidence, the State denied such information existed. Grant, on the other hand, insisted that the State possessed exculpatory evidence relative to a preliminary investigation. Apparently, Hudson spoke with an official of the Texas Drug Enforcement Agency who indicated that she had no knowledge of any drug-related activities to which Grant was connected. None of this information came to light at trial. Nothing prevented Grant from obtaining any documentation from Texas, or

any other jurisdiction for that matter, had he so desired. Be that as it may, we fail to see how undetected criminal activity or the absence of a criminal record in a single foreign jurisdiction would be exculpatory in light of other facts presented at trial from which the jury might properly infer Grant's predisposition. *See Jorgensen v. State* (1991) Ind., 574 N.E.2d 915 (discovery is not a treasure hunt whereby defendants search for exculpatory "gold" from any source imaginable).

counters, on a somewhat-related theme, that nondisclosure of a confidential informant's identity is favored unless disclosure is relevant or helpful to the defense or is essential to a fair trial.[4] *See Burst, supra.*

■ At trial, Grant testified that Becky, acting as a special agent of the State, coerced him to participate in the drug transaction. According to Grant, Becky not only initiated the contact between Grant and Hudson, but induced Grant's cooperation through repeated telephone threats directed towards Grant and his daughter. Grant insists that evidence of Becky's telephone toll calls would corroborate his testimony that she coerced him to agree to deal drugs for Hudson and would have cast doubt upon the credibility of Hudson who allegedly testified[5] that Becky *did not* contact Grant after the initial communication.

We disagree with this synopsis of Hudson's testimony. Hudson testified that he did not know and did not investigate whether Becky contacted Grant after Hudson initiated the call to Grant. Neither had Hudson given Becky any instructions concerning how she was to communicate with Grant. Thus, the jury was not forced to referee a credibility contest between a law enforcement officer and a criminal defendant as Grant complains. Moreover, even if Grant obtained and introduced Becky's

telephone records into evidence, the substance of the conversations, i.e., the alleged threats, would be unknown.

■ The crux of the matter is whether Grant should have been permitted to subpoena Becky to appear for a deposition. We need not address the contention that Becky was a confidential informant because Grant obviously had sufficient information to secure a subpoena.[6] Upon notification of the proposed deposition, the State argued that it was unduly burdensome, oppressive, and unreasonable to seek to depose a non-witness[7] two days before the scheduled trial. The trial court quashed the subpoena.

■ The trial court's authority to direct the discovery process is clear, but is tempered by a requirement for the appropriate exercise of discretion. *Norris v. State* (1987) Ind., 516 N.E.2d 1068 (trial court empowered to guide and control proceedings). We will reverse only upon a showing of an abuse thereof.

Throughout the trial, the court appropriately resolved a multitude of discovery-related conflicts. The record further reflects that both parties were provided with a sufficient amount of time for discovery. Grant requested and received continuances

---

4. This issue is more closely aligned with the denial of discovery rather than the disclosure of an informant's identity, as the State supposes. In any event, Becky's identity and general whereabouts were well-known before trial, as evidenced by Grant's attempts to depose her in California. Any interests the State might have had in preserving her anonymity were further compromised at trial when Agent Hudson testified concerning Becky's identity, her agreement to act as a drug informant in exchange for money and "time off" (probation) for a drug-related arrest, and her role in the instant undercover operation. The fact that the jury learned of Becky's "deal" with California authorities belies Grant's argument that this information could only be extracted through her deposition.

5. If any such testimony exists, our efforts to uncover it have failed. Grant did not provide a record citation where Hudson's statement to this effect may be found. Furthermore, we are at a loss as to what portion of the record contained the following: "Agent Hudson denied

that Becky Smith was having any continued contact with Mr. Grant and [Hudson] admitted that it would have been improper for her to do so.... Agent Hudson denied that such telephone calls were occurring." Reply Brief of Appellant at 6–7.

6. Further, although Grant's interpretation of *Jorgensen, supra* is correct, his reliance upon *Jorgensen* is unavailing. *Jorgensen* instructs that a trial court must consider two factors when ruling upon questions related to non-privileged discovery information: (1) whether the item sought to be discovered was sufficiently designated; and (2) whether the item was material to the defense. *Jorgensen, supra,* 574 N.E.2d at 917. As will be stated hereinafter, answering the questions affirmatively does not completely resolve this issue.

7. Neither Grant nor the State listed Becky as a witness as required pursuant to the trial court's standard discovery order.

in order to fully and fairly prepare his defense.

Presumably, Grant sought Becky's admission that she coerced him to buy the cocaine by repeatedly threatening him. This information was known by and available to Grant from the inception of the entire episode. In *Perry v. State* (1989) Ind., 541 N.E.2d 913, the defendant believed that two men, who were present in defendant's home during an illegal drug sale, would corroborate his story. The court there properly denied a request for additional preparation time to locate the potential witnesses because the defendant knew of their existence and had ample time to gather the information.

Grant had the opportunity to investigate and to develop the alleged exculpatory material. Procuring Becky's statement or listing her as a trial witness was within Grant's control. Grant did not provide a rationale for his eleventh-hour request for Becky's deposition nor can we envision one. The trial court did not err in quashing the subpoena.

### III. *Voir Dire*

■ Grant argues that the trial court erred in permitting the State to ask, "[D]o you see a distinction between a reasonable doubt and all reasonable doubt?" Supplemental Record at 24. Grant objected upon the grounds that the State incorrectly stated the law. The State counters that if the jury believed a guilty verdict required proof beyond "all" reasonable doubt, then the State would be held to a more stringent burden of proof.[8]

■ The substance and form of voir dire is entrusted to the trial court's discretion. *Hall v. State* (1986) Ind., 497 N.E.2d 916, 918. The trial court's decisions will only be reversed upon a showing of manifest abuse and the denial of a fair trial. Grant failed to make such a showing.

The trial court properly conveyed the concept of reasonable doubt to the jury throughout the proceedings. Further, the State reiterated during voir dire that a guilty verdict required proving the elements of the crime beyond a reasonable doubt. Defense counsel also quizzed prospective jurors concerning their understanding of proof of guilt beyond a reasonable doubt. Here, the purpose of voir dire, i.e., to ascertain the abilities of the veniremen to judge the facts fairly and to apply the law correctly, was accomplished.

The jury was fairly and fully instructed upon the burden of proof. The trial court, defendant, and the State each directed the jury's attention to a correct interpretation of the phrase "beyond a reasonable doubt." Having been so instructed, and without evidence to the contrary, we presume the jury correctly applied the law as instructed by the trial court. Thus, the trial court did not err in permitting the State to explore the concept of reasonable doubt during voir dire.

### IV. *Instructions*

■ Grant challenges several of the trial court's rulings upon instructions tendered by Grant and upon instructions given over his objection. First, Grant charges that he was entitled to a series of instructions[9] upon the lesser included offense of attempted possession of cocaine or narcotic drug. Second, Grant charges that his tendered instructions should have been given to counterbalance the trial court's instruction permitting a conspiracy to be inferred from Grant's acts and conduct. The standard of review for the refusal of tendered instructions is: (1) whether the tendered instruction correctly stated the law; (2) whether sufficient evidence supported the giving of the tendered instruction; and (3) whether the substance of the refused instruction was covered by other instructions. *Smith v. State* (1984) Ind., 468 N.E.2d 512.

■ Grant was not entitled to any instructions upon the crime of attempted pos-

---

8. Although this argument seems logical, the State provided no authority for it. Thus, we resolve this issue upon other grounds.

9. Grant's proposed instructions numbered 5, 7, and 8 comprise his second line of defense, i.e., that if guilty of any offense it was, at most, an attempt to possess cocaine or a narcotic drug.

session of cocaine or a narcotic drug. There is no evidence to support the fact that he attempted, but failed, to possess cocaine. To the contrary, Grant gave Officer Mote cash in exchange for a briefcase which contained a package Grant believed [10] to be cocaine. Grant then placed the briefcase into his own vehicle and was apprehended. Receiving the briefcase is "possession" insofar as Grant's claim that he was entitled to an attempt instruction is concerned. The trial court properly refused tendered instructions 5, 7, and 8.

■ Grant was not entitled to instructions which he proffered to diffuse the effect of an allegedly impermissible inference of conspiracy instruction.[11] The evidence supports neither the fact that Grant merely knew of or was present at the drug transaction [12] nor the fact that Grant merely had an understanding of the sales agreement [13] in question. Here, Grant set the wheels in motion for an on-going enterprise in which he would sell up to five kilos of cocaine per week supplied by Hudson. Grant pursued this opportunity by collecting the necessary funds and purchasing the first installment of the illegal drugs.

Further, the court specifically set forth the requirements necessary to prove conspiracy to commit dealing in cocaine or a narcotic drug. Thus, Grant's Proposed Instruction Instruction # 3, which simply states that conspiracy requires intent to commit a felony and an intent to agree to the same, is duplicative and need not have been given. Based upon the specific facts of this case, the trial court correctly refused Grant's tendered instructions.

■ Be that as it may, we must caution that an instruction upon the inference of conspiracy, *supra*, n. 11, may not be proper in all circumstances. Specifically, that portion of the instruction which states that proof of a conspiracy may be inferred "from acts and conduct" of the accused may become suspect under a different set of facts. For example, such an instruction might tend to mislead a jury in a situation in which the evidence of participation in the sale, i.e., the defendant's acts and conduct, *in and of itself*, also constitutes the conspiratorial act. In such situations, the defendant risks prosecution as a result of the illegal transaction as well as the conspiracy, i.e., two participants engaged in criminal activity.

Blurring the "sale" with the "agreement," absent evidence of a prior or contemporaneous agreement beyond the sale in question, could result in the impermissible multiple punishment for but one criminal act. *See Sharp v. State* (1991) 2d Dist. Ind.App., 569 N.E.2d 962, 970 (noting the dangers of confusing separate acts and crimes with separate conspiracies). It is incumbent upon the trial court to carefully evaluate the facts of record before a permissible inference instruction is given. We are not faced with such a dilemma, however, in the instant case because there is ample evidence of an agreement separate and distinct from the cash-drug transfer

---

**10.** Grant correctly concedes that it is of no moment that the package did not, in fact, contain a controlled substance. *State v. Gillespie* (1981) 3d Dist.Ind.App., 428 N.E.2d 1338.

**11.** Final Instruction X reads: "Proof of the existence of a conspiracy does not need to rest solely on words giving rise to an express agreement, but *may be inferred* from acts and conduct of the person accused, done in pursuance of an apparent criminal or unlawful purpose." Record at 198. (Emphasis supplied.) This instruction does not create, as Grant suggests, the mandatory inference or presumption which requires the reversal of criminal convictions. *Cf. Sandstrom v. Montana* (1979) 442 U.S. 510, 513, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 ("[t]he law presumes that a person intends the ordinary

consequences of his voluntary act."); *Yates v. Aiken* (1988) 484 U.S. 211, 212, 108 S.Ct. 534, 535, 98 L.Ed.2d 546 (that malice "is implied or presumed from the use of a deadly weapon.").

**12.** Grant's Proposed Instruction # 1 reads: "Mere knowledge of, or presence at, a drug transaction and association with co-conspirators are insufficient evidence of that person's agreement to conspire." Record at 177.

**13.** Grant's Proposed Instruction # 2 reads: "The relationship of a buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy to sell ... an illegal substance although both parties know of the illegal character of the goods." Record at 178.

itself. Thus, the trial court did not err in giving the State's proposed instruction permitting an inference of conspiracy to be drawn from the facts presented.

### V. *Ex Parte Communication*

 Grant alleges that the trial court's *ex parte* communication with the deliberating jury was reversible error. When the jury requests additional guidance from the court during its deliberations, the judge is required to notify the parties and then to respond to the jury's question in open court. *Purdy v. State* (1977) 267 Ind. 282, 369 N.E.2d 633. In determining whether an *ex parte* communication was error, we review "the nature of the communication to the jury and the effect it might have had upon a fair determination." *Marsillett v. State* (1986) Ind., 495 N.E.2d 699, 709.

In *Grey v. State* (1990) Ind., 553 N.E.2d 1196, 1198, a deliberating jury sent a note to the trial court asking "Was [sic] the words 'made penetration' in the confession state exhibit # 8." The court replied, either through a written note or through the bailiff, "We cannot. Rely upon your own notes and memory." *Id.* at 1198. Our Supreme Court held that the trial court's response that he could not answer, an impermissible *ex parte* communication, was harmless error. *See Brown v. State* (1989) Ind., 543 N.E.2d 1120, 1121 (affirming conviction where court first sent a signed note to the jury indicating the transcript was unavailable and next sent a handwritten note instructing the jury to rely upon its memory). Further, our Court has stated that "when the trial judge merely responds to a jury question by denying the request, any inference of prejudice is rebutted and any error is deemed harmless." *Thompson v. State* (1990) 2d Dist.Ind.App., 555 N.E.2d 1301, 1304, *trans. denied. Cf.*

*Childers v. State* (1980) 3d Dist.Ind.App., 408 N.E.2d 1284 (trial court's *response* to jury question in open court, but in absence of defendant, required reversal).

Here, the trial court responded to a question forwarded by the jury by returning the request and indicating that he could not answer the question. The contents of the note cannot be confirmed because the trial court neither retrieved nor preserved the note for the record as Grant requested. However, the trial court stated that "[i]t was some question about Becky and entrapment and special agents and I looked at it as a question I couldn't possibly answer nor could counsel answer." Record at 882.

 It is unfortunate, to say the least, that the trial court failed to preserve the note.[14] It is the responsibility of the trial court to preserve the record and the failure to do so impedes our review. The haphazard management of trial documents that may provide the cornerstone of an appellant's argument cannot be condoned. We note, however, that Grant could have availed himself of the opportunity to reconstruct the contents of the note through affidavits of the jurors or bailiff, but failed to do so. *See Driver v. State* (1992) 1st Dist.Ind.App., 594 N.E.2d 488, 493, *trans. denied* (conviction reversed, in part, due to representation in juror affidavit relating subject of a note given to the bailiff, but thrown away in jury room).

Knowledge of the precise wording of the question is of the essence in determining whether Grant was prejudiced by the trial court's response or, for that matter, a non-response, e.g., "Rely upon your own memory." Unless the substance of the communication is known, the effect a particular response would have had upon the jury cannot be determined. Simply put, we will

---

**14.** We are more concerned, however, with the disturbingly recurrent misconception of the proper procedure to be followed when faced with a communication from a deliberating jury. Here, the trial court stated that "the only time the Indiana Supreme Court requires that I bring [a jury question] to counsel is if I intend to answer it in some way." Record at 881. We redirect the attention of the bench to Ind.Code 34–1–21–6 (Burns Code Ed.1986) which sets forth the requisite procedure in the case of questions posed by a deliberating jury. *See also State of Indiana ex. rel. Courtney v. Superior Court of Marion County, Criminal Division 4* (1988) Ind., 528 N.E.2d 64 (trial bench reminded to re-read prior case law and pertinent statutory provisions).

not resort to speculation upon these matters. *Marsillett, supra.* We know only the fact that the trial court refused to answer a jury question. Although the trial court's *ex parte* communication was error, it must be deemed harmless. *Grey, supra; Thompson, supra.*

### VI. *Sufficiency*

██ Finally, Grant asserts that the evidence presented during the State's case-in-chief was insufficient to demonstrate that Grant was predisposed to commit the crime charged. Restated, Grant believes that the evidence was sufficient, as a matter of law, to establish entrapment. Given the fact that the State conceded that it induced Grant's criminal activity, the factual issue before the trial court was whether the State demonstrated Grant's predisposition. The standard for appellate review of sufficiency challenges is well-settled: we neither reweigh the evidence nor judge the credibility of the witnesses. *Smedley v. State* (1990) Ind., 561 N.E.2d 776.

██ Ample evidence exists from which Grant's predisposition was accepted and his defense of entrapment ultimately rejected. When the State initiates contact with a defendant, the government bears the burden of proving that the defendant was predisposed to commit the crime charged. *Jacobson v. U.S.* (1992) — U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174. Conversely, entrapment exists when an otherwise law-abiding citizen is persuaded by a government agent or someone working for the agent to commit the crime charged. *Fearrin v. State* (1990) 1st Dist.Ind.App., 551 N.E.2d 472, 473, *trans. denied.*

The State could have adequately established predisposition to deal drugs by demonstrating such matters as Grant's "knowledge of prices and sources, possession of large quantities of the narcotic, ability to obtain access to narcotics in a short time, willingness to engage in future transactions, eagerness in the transaction in question, and knowledge of slang." *Fearrin, supra,* 551 N.E.2d at 474. Here, the rec-

ord is replete with evidence of Grant's conduct, in word and deed, demonstrating predisposition.

Initially, Grant accepted the invitation to contact Hudson to set up a cocaine deal by returning Hudson's telephone message. The jury heard many tape-recorded conversations during which Grant talked about various marketing concepts and the cost of cocaine using "street" terminology.

It is fair to say that Grant actively and anxiously pursued the sale of cocaine through Hudson's "runner," Officer Mote. Grant collected the funds necessary to purchase the cocaine over the span of a few days. The frequency and urgency of Grant's telephone calls leading to the finalization of the deal further demonstrated that Grant was a willing and eager participant in the controlled buy. During the State's case-in-chief, the jury also was apprised of the deal struck with the confidential informant to provide names of drug dealers, such as Grant, to law enforcement agencies. We will not invade the province of the jury to assess the strength and credibility of this fact against the evidence of Grant's protracted history of involvement with narcotic drugs.

The evidence sufficiently established the nexus from which Grant's predisposition to commit dealing in cocaine could be inferred. The trial court properly denied Grant's motion for acquittal at the close of the State's case-in-chief. Ultimately, it was for the jury to assess Grant's entrapment defense in light of the predisposition evidence presented by the State.[15]

The conviction is affirmed in all respects.

FRIEDLANDER and RUCKER, JJ., concur.

---

**15.** In the final analysis, Grant's testimony, that he had removed himself "completely" from the

drug lifestyle, was but another factor for the jury to consider in resolving the matters of

predisposition and entrapment. Whether Grant's rehabilitation was sufficiently enduring or steadfast so as to eradicate predisposition was for the jury to decide.