991 F.2d 796
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Shawn FEARS, Defendant-Appellant.
 No. 92-3459.
 United States Court of Appeals, Sixth Circuit.
 March 30, 1993.
 
 Before NELSON and BATCHELDER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Under 21 U.S.C. § 841, a person who possesses five or more kilograms of cocaine with intent to distribute it faces a mandatory minimum sentence of ten years in prison. The statute mandates a minimum sentence of 20 years if the offense is committed after a prior conviction for a felony drug offense. The same penalties apply, under 18 U.S.C. § 846, to a person who conspires to possess five or more kilograms of cocaine with intent to distribute it.
 
 
 2
 The defendant in the case at bar, a 21-year-old drug dealer who was caught in a "reverse sting" operation staged by federal law enforcement authorities, pleaded guilty to a charge that he conspired to possess approximately 15 kilograms of cocaine with intent to distribute it. The defendant had a prior conviction for a felony drug offense, and the district court sentenced him to imprisonment for 20 years.
 
 
 3
 In appealing this sentence, the defendant maintains that he was talked into accepting more cocaine than he had set out to buy. His original intent, he told the district court, was to purchase four kilograms. As he reserved the right to do in his plea agreement, the defendant argues that he was a victim of "sentencing entrapment." To base the sentence on a quantity of cocaine in excess of four kilograms, he submits, is to violate his rights under the Due Process Clause of the United States Constitution.
 
 
 4
 We find no constitutional violation here. There has been no showing, in our view, that the defendant's will was overborne by anything the government did, and we have no reason to doubt that the defendant was predisposed to accept five or more kilograms of cocaine. Accordingly, and because we are not persuaded by a subsidiary argument advanced by the defendant, we shall affirm the sentence.
 
 
 5
 * On October 1, 1991, according to testimony presented at his sentencing hearing, the defendant, Shawn Fears, received a telephone call from a drug dealer identified only as "Sunny." Defendant Fears knew about Sunny from his previous involvement in drug transactions; what he did not know was that Sunny was now cooperating with the government. The telephone conversation, like subsequent conversations between the two men, was recorded on tape.
 
 
 6
 Sunny asked if defendant Fears could buy some drugs, starting with four kilograms of cocaine. Mr. Fears' response was "yes," and a cash price of $15,000 per kilogram was negotiated at some point. Sunny also brought up the idea of "fronting" drugs to Fears--giving him drugs for which payment would be made later--and Fears was amenable to this idea as well.
 
 
 7
 Sunny and defendant Fears spoke by telephone several times during the month of October. The tapes of these calls are not part of the record, and Mr. Fears' own account of what was said is somewhat self-contradictory. The most logical interpretation of the record, we believe, is that Sunny urged Fears to take a larger amount of cocaine than had been mentioned originally; that Fears did not reject this idea; that Fears was to pay cash on delivery for part of what he received, and was to be fronted the rest;[1] and that Fears ultimately agreed to meet Sunny at a Radisson hotel in Cleveland, Ohio, to pick up some fifteen kilograms of cocaine.
 
 
 8
 The meeting was set for October 24, 1991, less than four weeks after Sunny's original overture. There was a misunderstanding about the location of the meeting; Fears thought it was to be at a Radisson hotel in the suburbs, and he had a female accomplice, Ethel Phillips, rent him a room there. What Sunny actually had in mind was a downtown hotel. Defendant Fears and Ms. Phillips eventually showed up at the downtown Radisson, where they met with Sunny and an undercover government agent who was masquerading as Sunny's New York supplier.
 
 
 9
 The agent brought to the meeting fifteen kilograms of cocaine that had been wrapped in one-kilogram packages and placed inside a duffel bag. Defendant Fears was handed one of the packages to inspect, after which he turned over a large sum of cash. Fears and Phillips were then arrested. These events were surreptitiously videotaped, and the videotape was subsequently played for the district court.
 
 
 10
 Defendant Fears stated at his sentencing hearing that he had been asked to bring $105,000 to the meeting. It is undisputed that he brought two bags containing $84,155--enough to pay for 5.6 kilograms and to justify the fronting of a like amount, as we understand it. Fears admits having told Sunny he was "$15,000 short." According to the government agent, Fears said he could get the rest of the money within an hour.
 
 
 11
 Although defendant Fears told the court at the plea hearing that he had tried to purchase fifteen kilograms at the hotel, he said at his sentencing hearing that he was expecting to receive only four kilograms in exchange for the $84,000. He also acknowledged that the cash price was to be $15,000 per kilogram, however, and he did not deny that he turned over the full $84,000. He was unable to offer any explanation at all as to why he gave Sunny $24,000 more than was necessary to pay for four kilograms.
 
 
 12
 In argument before the district court, Mr. Fears' able and experienced counsel said it was his impression that although Mr. Fears originally wanted four kilograms, he "had been convinced by Sunny that if he brought more money up to $105 thousand he could get 15 [kilograms]." Counsel continued as follows:
 
 
 13
 "So, I guess drug dealers are greedy and he saw this as an opportunity for him to be a big man. I am not lauding that type of thinking. That's why he had additional money. He had been convinced to bring some additional money up to $105 thousand and that he would be given a like amount to what he was able to purchase.
 
 
 14
 I'm not saying when he went to the hotel he wasn't looking to go get more drugs than the four he initially wanted.
 
 
 15
 I'm saying that he was 'entrapped' into taking more once the informant indicated to him he could get some more and he was willing to front it."
 
 
 16
 The district court, not surprisingly, found that although the introduction to the deal had been at a four kilogram level, it had developed into a fifteen kilogram transaction by the time the sale was to be consummated. The government agent who posed as Sunny's supplier was asked at the sentencing hearing whether he observed any hesitancy on defendant Fears' part about completing the drug transaction. His answer was "[n]one whatsoever." This testimony stands uncontradicted in the record, and we must evaluate the legal arguments accordingly.
 
 II
 
 17
 Defendant Fears' first argument is that "due process is violated where [in a government sting operation] the government willfully manipulates the quantity of drugs involved so as to artificially increase the sentence of the person victimized thereby."
 
 
 18
 One problem with this argument, it seems to us, is that defendant Fears was "victimized" just as much by Sunny's offer to provide him four kilograms of cocaine as he was by the offer to provide 15 kilograms. If the offer of four kilograms did not violate defendants Fears' due process rights--and he does not contend that it did--it is hard to see how the offer of a larger quantity could have done so.
 
 
 19
 The four kilogram figure originated with Sunny, not with defendant Fears. If Sunny had begun by asking Fears if he wanted to buy five kilograms, we have no reason to suppose that the answer would have been anything other than a prompt "yes." By the same token, there is nothing in the record to suggest that defendant Fears was at all reluctant to accept the additional kilograms that Sunny offered to "front" him. And while defendant Fears may have hesitated, initially, about going on the line for as many as fifteen kilograms, there is no indication that his decision to accept that quantity resulted from his will having been overborne. Defendant Fears had plenty of time to think about what he was doing as he put together the $84,000 stake that he brought to the Radisson hotel, and we have no doubt that when he went into the hotel room he expected--and wanted--to receive more than five kilograms of cocaine for his investment.[2]
 
 
 20
 Defendant Fears points to dicta in United States v. Lenfesty, 923 F.2d 1293, 1300 (8th Cir.), cert. denied, 111 S.Ct. 1602 (1991), where, speaking through Judge Richard Arnold, the Court of Appeals for the Eighth Circuit noted that it
 
 
 21
 "was not prepared to say that there is no such animal as 'sentencing entrapment.'[3] Where outrageous official conduct overcomes the will of an individual predisposed only to dealing in small quantities, this contention might bear fruit." (Citation omitted.)
 
 
 22
 The record in Lenfesty, as the Eighth Circuit held, showed that the defendant was predisposed to help the government's undercover agent find whatever quantities of drugs he desired. In the case at bar, similarly, defendant Fears was clearly predisposed to deal in quantities which, if not expandable without limit, at least amounted to five or more kilograms. The conduct of those conducting the sting was by no means outrageous, and it certainly did not overcome Mr. Fears' will.
 
 
 23
 This circuit has recognized that there may be circumstances under which concepts of fundamental fairness would preclude the police from increasing a defendant's sentence by manipulating the quantity of drugs with which the defendant was involved. See United States v. Sivils, 960 F.2d 587 (6th Cir.), cert. denied, 113 S.Ct. 130 (1992), where a defendant negotiated for $15,000 worth of cocaine without nailing down a precise quantity of drugs to be provided for that sum. Law enforcement officials participating in a sting operation decided to supply a full kilogram, notwithstanding a suggestion that they might have been able to get away with supplying as little as 498.96 grams. Anything under 500 grams would have meant a lower base offense level under the sentencing guidelines. While noting that "[t]here is indeed something very disturbing about the government having the power to manipulate a sentence by essentially changing the market value of the cocaine," id. at 598, we affirmed the sentence in Sivils because the record revealed that the defendant had ratified the amount that was actually supplied. Id. at 599. Because the defendant ratified the amount chosen, we did not reach the issue of predisposition. Id. at n. 2.
 
 
 24
 In the case at bar, of course, it is clear not only that defendant Fears was predisposed to deal in large quantities of cocaine, but also that he ratified the decision of Sunny and his handlers to supply him five or more kilograms. Under the holding of Sivils, we must therefore reject defendant Fears' due process argument.
 
 
 25
 Although we have no doubt that the mandatory 20-year sentence received by Mr. Fears was constitutional, we acknowledge that the wisdom of such a sentence may be debatable. On the one hand, many professional drug dealers with prior felony drug convictions and a demonstrated willingness to deal in multi-kilogram quantities of cocaine could never be trusted not to return to the drug trade if given an opportunity to do so while still relatively young--and a strong case can be made that society's interests are best served by keeping such people off the streets into middle age or beyond. On the other hand, 20 years is a very long time indeed--and some young men in situations like defendant Fears' could doubtless be salvaged before the age of 40. If there were any reasonably reliable way of knowing that defendant Fears could be expected to behave himself after serving a sentence of less than 20 years, a 20-year sentence would strike many as harsh.
 
 
 26
 Counsel for defendant Fears made an eloquent statement at oral argument about the tragic waste of human lives entailed in the lengthy drug sentences that are being imposed on large numbers of young men from a particular stratum of society. It is tragic, of course--and so too is the damage these young men inflict not only on themselves, but on the world around them and on generations yet to come. Some relaxation of the current structure of mandatory minimum sentences might have a marginally beneficial effect as far as the less hopeless cases are concerned, but no such change, obviously, would solve our drug problem. Neither would even harsher sentences, in all probability; the solution, if there is one, must come from the individuals for whom drugs and drug money are proving to be such a temptation.
 
 
 27
 Each of us has the capacity to choose between right and wrong and the responsibility to choose the right. Defendant Fears, notwithstanding his prior conviction, chose to remain in the drug business. The government did not force him to make that wrong choice; he made it himself, and he made it voluntarily. The price our law says he must pay for what he did is a high one,[4] but the law says what it says. The statute is not unconstitutional, as it applies to Mr. Fears; we do not know whether its application here is just or unjust, but the courts have no discretion to order a shorter sentence in any event.
 
 III
 
 28
 The second argument advanced by defendant Fears relates to the role that Ethel Phillips played in the conspiracy. The evidence suggested, as the district court stated, that Ms. Phillips went with defendant Fears to pick up the fifteen kilograms of cocaine because Sunny urged Fears to bring her,[5] and not because Fears himself wanted her there. While Ms. Phillips may have been part of a conspiracy to possess the four kilograms of cocaine first mentioned by Sunny, it is suggested, no conspiracy can be said to have existed with reference to any additional kilograms.
 
 
 29
 We do not find the suggestion persuasive. For one thing, it appears, the four kilograms for which defendant Fears originally agreed to pay cash on delivery were to be accompanied by an additional four kilograms advanced on credit. That alone was enough to push the quantity of cocaine involved past the critical level of five kilograms. Although it was doubtless Sunny's idea that defendant Fears should bring Ms. Phillips to the hotel, moreover, it was not his idea that she should rent a room there for Fears. The renting of the room was Fears' idea, and he clearly and unequivocally ratified the proposal that Ms. Phillips should play a role in the consummation of the deal that was ultimately negotiated.
 
 
 30
 AFFIRMED.
 
 
 31
 CONTIE, Senior Circuit Judge, concurring.
 
 
 32
 I concur in the majority opinion because defendant brought to the hotel room enough money to purchase in excess of five kilograms of cocaine, indicating that he had the intention and capacity to deal in that amount of cocaine. In United States v. Gessa, 971 F.2d 1257, 1265-67 (6th Cir.1992) (en banc), this court stated it must be demonstrated that a defendant had the intention and capacity to produce amounts of cocaine which are allegedly under negotiation, but which are not the subject of a completed transaction in order to use those amounts for sentencing. For this reason, I disagree with the majority's statement in footnote # 3 that " 'sentencing entrapment' can exist only in a habitat where there is no predisposition to do the thing that results in the higher sentence." Although a defendant may have the predisposition to deal in larger amounts of drugs, it is posible for the government to entrap him for sentencing purposes into engaging in discussions about quantities of drugs which he is not capable of purchasing or producing. In the present case, defendant demonstrated that he had the capacity to purchase in excess of five kilograms of cocaine and thus was properly sentenced. For this reason, I concur in the majority's opinion, but do not join in the discussion on the fundamental fairness of lengthy sentences or the discussion of the legislative wisdom of imposing lengthy sentences.
 
 
 
 [1]
 Fears stated at one point that he was to be fronted an amount equal to the amount for which he was paying cash on delivery; elsewhere, however, he said he did not know how much he was to be fronted. The testimony of a government witness indicates that Fears was going to be fronted at least as much as he was to pay cash for
 
 
 [2]
 Under the statute, of course, it is the five kilogram figure that is significant. There may be some room for doubt as to whether defendant Fears was expecting as many as fifteen kilograms. If only 50 percent of the total was to be fronted, and if there was not to be any quantity reduction in the agreed price of $15,000 per kilogram, the $105,000 that Fears had been asked to bring would only have been enough for 14 kilograms. There can be no doubt, however, that defendant Fears had made arrangements to possess an amount sufficient to trigger the 20-year minimum sentence, that amount being five or more kilograms
 
 
 [3]
 We are not prepared to say so either. Like Judge Arnold, however, we believe that if there is such an animal as "sentencing entrapment," it can only exist in a habitat where there is no predisposition to do the thing that results in the higher sentence. See United States v. Twigg, 588 F.2d 373, 376 (3d Cir.1978), a non-sentencing case where Judge Max Rosenn observed that "[t]he entrapment defense requires an absence of predisposition on the part of the defendant to commit the crime."
 See also Jacobson v. United States, 112 S.Ct. 1535 (1992), where the Supreme Court accepted an entrapment defense asserted by a man who had purchased child pornography through the mail after 26 months of repeated mailings and communications by government agents masquerading as smut peddlers. The Jacobson Court went out of its way to say that "an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later." 112 S.Ct. at 1541. What the courts will not countenance is "the apprehension of an otherwise lawabiding citizen who, if left to his own devices, likely would have never run afoul of the law...." Id. at 1543.
 
 
 [4]
 The price is particularly high for Mr. Fears, because he is the father of a child who can be expected to have reached maturity by the time the 20-year sentence has run. Mr. Fears, according to his presentence report, knows first hand what it means to grow up without a father; the prospect of his own child suffering the same deprivation that he did must be a sobering one
 
 
 [5]
 The government's undercover agent testified that it is common for a man purchasing drugs to utilize a woman to carry the drugs; dealers believe that couples are less suspicious than individual men, and that law enforcement officials are less likely to search a female or a couple